

## SUPREME COURT OF GEORGIA

March 15, 2023

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

It appearing that the attached opinion decides a second-term appeal, which must be concluded by the end of the December Term, it is ordered that a motion for reconsideration, if any, must be **received** in the Supreme Court E-Filing/Docket (SCED) System **by 2:00 p.m. on Wednesday, March 22, 2023.**

**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

_____, Clerk

NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 15, 2023

S22A1060.  TAYLOR v. THE DEVEREUX FOUNDATION, INC. et al.

S22X1061.  THE DEVEREUX FOUNDATION, INC. et al. v. TAYLOR.

WARREN, Justice.

This appeal and cross-appeal stem from the sexual assault of a 15-year-old girl, Tia McGee (whose interests are represented by Jo-Ann Taylor, the executor of her estate), while McGee was living in a behavioral health facility that was operated by the Devereux Foundation ("Devereux").[1]  The sexual assault was perpetrated by Jimmy Singleterry, a Devereux employee who was charged with supervising McGee and other girls in a cottage where they were living at the Devereux facility.  At trial, Devereux admitted that "Devereux breached the legal duty of ordinary care owed to Tia

---

[1] Although McGee initially filed suit, Taylor later replaced McGee as the plaintiff, first as McGee's conservator and then (following McGee's death after the trial) as the executor of McGee's estate.

McGee for her safety from sexual assault and that the breach of Devereux's legal duty contributed to Jimmy Singleterry's sexual assault of Tia McGee." The jury returned a verdict for $10,000,000 in compensatory damages, finding both Devereux and Singleterry, the employee who assaulted McGee, at fault, and $50,000,000 in punitive damages against Devereux. The trial court ultimately reduced the jury's punitive-damage award from $50,000,000 to $250,000, consistent with the statutory cap on punitive damages found in OCGA § 51-12-5.1 (g).

Taylor contends that OCGA § 51-12-5.1 (g) violates the rights to trial by jury, separation of powers, and equal protection guaranteed by the Georgia Constitution. As the party challenging the constitutionality of a statute, Taylor has the burden to show that there is a "clear and palpable" conflict between OCGA § 51-12-5.1 (g) and the Georgia Constitution, "and this Court must be clearly satisfied of its unconstitutionality." *Barnhill v. Alford*, 315 Ga. 304, 311 (882 SE2d 245) (2022) (citation and punctuation omitted). We conclude that Taylor has not satisfied that burden here.

2

Following the framework this Court laid out in *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga. 731 (691 SE2d 218) (2010), and earlier cases addressing Georgia's constitutional right to trial by jury, we conclude that although Taylor's claim for premises liability would have been available in Georgia in 1798,[2] and although juries were authorized to award in certain instances damages to punish the defendant and not merely to compensate the plaintiff, Taylor has failed to show that a Georgia jury in 1798 was authorized to award punitive damages for the kind of claim she brought in 2017. Specifically, Taylor has failed to show that a jury would have been authorized to award punishment damages for a claim alleging that the defendant acted only with an "entire want of care," rather than for a claim alleging that the defendant engaged in intentional misconduct. Thus, Taylor has failed to prove that the punitive damages she seeks are within the scope of her Georgia constitutional right to a jury trial.

---

[2] As we explain more below in Division III (a), 1798 is the date we have historically used to evaluate the Georgia Constitution's "inviolate" right to trial by jury.

We further conclude that the punitive damages cap contained in OCGA § 51-12-5.1 (g) does not violate the separation of powers or equal protection guarantees in the Georgia Constitution. As a result, we reject Taylor's challenges to OCGA § 51-12-5.1 (g) under the Georgia Constitution and affirm the trial court's application of OCGA § 51-12-5.1 (g) to the jury's damages award.

In Devereux's cross-appeal, we apply the "any evidence" standard in reviewing the jury's award of punitive damages and attorney fees and conclude that there was evidence to support awarding both. Applying that same standard, we further conclude that there was evidence to support the amount of attorney fees awarded and therefore affirm the trial court's attorney fee award. Finally, we conclude that the trial court did not err in starting the accrual of post-judgment interest at the time the jury verdicts for compensatory and punitive damages were returned by entering the judgments for those verdicts nunc pro tunc. Thus, we affirm the trial court's judgments in both the appeal and cross-appeal.

4

I. *Background*

In April 2012, 15-year-old Tia McGee began living at Devereux's Georgia facility, receiving treatment for mental conditions stemming, at least in part, from a history of sexual abuse. In May, McGee was sexually assaulted by James Singleterry, a direct-care professional at Devereux.

After McGee was assaulted, she filed a lawsuit against Devereux and Gwendolyn Skinner, the executive director of "Devereux's Georgia Treatment Network,"[3] alleging general negligence; negligent hiring, training, and supervision; professional negligence; respondeat superior; and failure to keep the premises safe.[4] She also requested punitive damages under OCGA § 15-12-

---

[3] At the close of Taylor's case-in-chief, Skinner moved for a directed verdict as to her, which was granted on the ground that she was a corporate officer who did not directly participate in employee training.

[4] Commonly referred to as "premises liability," this claim is based on a landowner's general "duty to keep its premises safe for visitors." *Cham v. ECI Mgmt. Corp.*, 311 Ga. 170, 173 (856 SE2d 267) (2021). See also OCGA § 51-3-1 ("Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.").

5.1, alleging that Devereux's conduct "was such as to evince an entire want of care and indifference to the consequences of such conduct," and expenses of litigation under OCGA § 13-6-11, alleging that "Defendants have acted in bad faith, have been stubbornly litigious, and/or have caused Plaintiff unnecessary trouble and expense." Before trial, Devereux conceded that it acted negligently. A jury trial on damages and attorney fees was held from November 12 to 19, 2019, and the following evidence was presented.

A. *The Sexual Assault*

On April 16, 2012, when McGee was 15 years old, she was admitted to Devereux's Georgia facility to receive in-patient treatment. Her admission evaluation noted that she had a history of harming and threatening to kill herself; that she had repeatedly been sexually abused, which "may have led to sexual reactivity"; and that she reported "having obsessive thoughts about sex." Five days after her admission, McGee was involved in a sexual incident, where a male patient touched her "on top of her clothes between her thighs." The next day, McGee asked a different male patient to

6

"touch her . . . vaginal area over her clothes," which he did. And on May 10, a patient reported that another patient had been "fingering" McGee. Karsten Hartman, a Devereux employee who helped with training staff and investigating incidents like these, acknowledged during his testimony that one of the reasons these incidents took place was "poor supervision" and that "further training was needed of whatever staff was responsible for the kids at that time." He did not know, however, if that staff was given any additional training or disciplinary action.

On May 17, about a month after McGee's admission, Akeavia Mays and Jimmy Singleterry, direct-care professionals, were assigned to the 3:00 to 11:00 p.m. shift to supervise the girls' cottage where McGee was staying. At about 10:30 p.m., Singleterry went outside the cottage for about 12 minutes. During this time, he walked to McGee's bedroom window and stuck his penis inside, and McGee performed oral sex on him. Mays, who was unaware of Singleterry's actions, left the cottage at about 10:50 p.m. to go to the bathroom before clocking out for the day. Singleterry then went into

7

McGee's room and had sexual intercourse with her. When the direct-care professional assigned to the next shift, Olenette Hudson, arrived at the cottage at 11:15 p.m., Singleterry was standing in the doorway to the cottage, which Hudson testified was "unusual" but did not cause her to suspect that he had engaged in sexual activity with a resident.

McGee reported this incident two days later to Tony Foster, another direct-care professional. McGee was taken to the hospital, where a rape kit was administered. The police were notified and conducted an investigation, including speaking to McGee, resulting in Singleterry entering a guilty plea on October 29, 2013, to one count each of child molestation, statutory rape, and sexual assault against a person in custody.[5] As part of Devereux's internal investigation, a "root cause analysis" was conducted, which identified one of the "most proximate factors" of the crimes as Singleterry's assignment to a female cottage and his "opportunities

---

[5] For each count, Singleterry was sentenced to concurrent sentences of 20 years, with the first 12 in prison and the remainder on probation.

to be alone with [McGee] by taking an unauthorized break and his co-worker leaving the shift early." The report also noted that because Mays left early without notifying her supervisor, "the unit was not in compliance with the required staff[-]client ratio for 25 minutes."[6]

McGee continued to receive treatment at Devereux. Immediately after the assault, she was given "one-to-one supervision," but she was not moved from the cottage where the assault happened. Dr. Nancy Aldridge, a psychotherapist who interviewed McGee in 2018 and 2019, testified that "generally speaking," it is "not a good idea" to keep the assault victim in the same location "because it causes them . . . to think about [the incident], to relive it" and to feel unsafe. Dr. Aldridge further explained that McGee's therapy notes indicate that, although the therapists continued to speak with McGee about her history of

---

[6] According to Devereux's supervision ratios that were in place before McGee was assaulted, two direct-care professionals were required to supervise the cottage during the 3:00-11:00 p.m. shift. Only one was required on the 11:00 p.m.-7:00 a.m. shift, when residents were expected to be asleep.

sexual abuse, they did not specifically address Singleterry's sexual assault of her. Dr. Aldridge testified that this lack of acknowledgement or apology was "significant" because McGee "was never supported as to what happened to her."

When McGee was interviewed by Dr. Aldridge in 2018, McGee indicated that she "felt guilty" and "blamed [her]self" after this incident and that she had "flashbacks" related to the incident. McGee was discharged from Devereux's facility on June 29, 2012. Her discharge summary noted that while at Devereux's facility, a therapist worked with McGee to overcome her sexual trauma and that in the "later half of her treatment," McGee "interact[ed] more appropriately with her peers and staff and . . . displayed better coping skills" but would still "need ongoing therapy to focus on sexual trauma history and sexual acting out behaviors." McGee died after the trial, in August 2020.

B. *Devereux's Employment Policies*

Mary Esposito, an assistant executive director at Devereux, testified that the procedure for hiring a direct-care professional,

which was applied to Singleterry, required contacting the applicant's references; doing a background check through an independent company; sending the applicant's information to the Chamblee Police Department, which also did a background check; and sending the applicant's fingerprints to "the State agency" to be cleared.[7] None of this information about Singleterry indicated any history of sexually assaulting or otherwise abusing children or adults. Singleterry also signed a statement, as required of all Devereux direct-care professionals, that he had "never been shown by credible evidence . . . to have abused, neglected, sexually exploited, or deprived a child or adult or to have subjected any person to serious injury as a result of intentional or grossly negligent misconduct." Mays testified that Singleterry made her "uncomfortable" and he seemed "creepy" and like a "womanizer," but

---

[7] Skinner testified that Devereux's background check procedure was required by the State Department of Behavioral Health because Devereux is a "psychiatric residential treatment facility." Skinner acknowledged that a background check had been run on all of the Devereux employees, including on those who later abused patients, saying, "[a] background check is not going to keep someone from abusing a child."

11

acknowledged that he had not said or done anything to make her think he posed a risk of sexually harming any patient.

Testimony from Hartman and Singleterry's employment documents showed that Singleterry, like all Devereux direct-care professionals, was trained about maintaining appropriate boundaries and sexual-risk reduction. Mays and Hudson, however, testified that they were not given any training about how to deal with patients, like McGee, who were "sexually reactive." Mays further testified that she was not told of McGee's "sexual reactivity," and if she had been, she would not have left her shift early, knowing that the only other direct-care professional supervising the cottage was a man. Foster testified that girls' units were required to be supervised by at least one female employee.[8] Hudson testified that sometimes shifts did not have the required ratios of staff to patients

---

[8] Foster testified that he understood that one of the reasons for this gender-based policy was "the possibility" that a staff member could interact or be alleged to have interacted "inappropriately with a patient." Skinner, however, testified that Devereux had "no gender-specific policy, except saying that same-sex employees will supervise staff when it is on matters that require privacy: restroom, things like that" and that sometimes it was okay to have a male staff member supervise a female cottage alone, including if all of the girls were "in bed asleep."

and that she had seen instances of a male staff member supervising a female cottage alone. She testified that Devereux management was "already aware" of this situation and when she complained, nothing was done about it.

Mays testified that Devereux was frequently short-staffed, and Hartman testified that Singleterry was assigned to a female cottage because Devereux had "a limited staff on the shift" and "a lot of new, unseasoned staff." Hartman further explained that Singleterry was assigned to the cottage where McGee lived because the girls in that cottage "were better behaved" than the girls in the other cottage and they had an early bedtime because most of the girls were on the "red phase."[9] Foster testified that Singleterry was usually assigned to a male unit and he thought that if Singleterry was assigned to a female cottage, "that would be a mismatch for him."

Hudson testified that although Devereux's management was aware of the problem of direct-care professionals leaving their shifts

---

[9] Hartman also testified, however, that "red phase" patients were the "lowest level . . . behavior-wise" and were "the most challenging ones to deal with." McGee was classified as "red phase" at that time.

early, no one disciplined those who left early or otherwise addressed the problem. Mays similarly testified that she had left her shift early before and not gotten in trouble, and she did not get in trouble for leaving early on the night of the sexual assault.[10] Foster testified that "people did turn a blind eye to a lot of things at Devereux." He also testified that he knew that people "often" left their shift at the cottages early, describing it as a "loophole," where staff would leave the cottage and "go to the main building and use the restroom and just kind of mingle around there for 15 minutes" until it was time to clock out. He testified, however, that people were disciplined for leaving early if the supervisor found out.

As part of Devereux's investigation into the sexual assault, some changes to Devereux's hiring and training procedures were suggested, including investigating the use of an extra screening

---

[10] Foster testified that he was told that Mays was fired for her part in allowing the assault, but Mays testified that she chose to leave Devereux because she felt "overall afraid" and that after a particular incident "where a client pushed a door on [her]," she "couldn't do it anymore." Skinner testified that Mays was not disciplined for leaving early on the night of the assault because Devereux was waiting until the police investigation was finished, and Mays left her job at Devereux before then.

14

service in the hiring process, developing a video to demonstrate how proper shift exchange should be done, incorporating role plays that "focus on the risks of working with sexually reactive youth" into the training for direct-care professionals, and adding specific information in each client's treatment plan to address any "sexually reactive" behavior. None of the Devereux employees could testify as to whether any of these actions were actually implemented, and Foster specifically testified that he had never seen a video about shift change or participated in role-plays for interacting with "sexually reactive" youth.

### C. *Other Similar Incidents*

At trial, Taylor introduced evidence of incidents of sexual abuse at Devereux facilities in other states: three incidents before 2012 that involved a Devereux staff member sexually assaulting a patient and five that happened after 2012. In addition, with respect to the Georgia facility, Taylor introduced evidence that a therapist who was employed at the facility was arrested in 2017 for possession of child pornography and admitted that he was "grooming" two

15

patients. Also, Foster testified that in 2013, two or three female patients in the Georgia facility held another female patient down and penetrated her with pencils, and Hudson testified that in 2013, a group of male patients "pulled out their penises and spanked [another male patient] in the face and then they sat in his face." Foster and Hudson each testified that they did not "know where the staff was" during the incidents.

When these incidents were introduced, the trial court gave a limiting instruction, directing that "other similar incidents that occurred prior to May 17th, 2012" were admitted for the limited purpose of "show[ing], if they do, knowledge, notice, and intent on the part of the defendants" and "[e]vidence of other similar incidents that occurred after May 17th, 2012" was "admissible on the issue of punitive damages." Similar instructions were given in the final charge to the jury.

D. *The Verdict*

Because Devereux had conceded before trial that it acted negligently, the trial court told the jury that Taylor and Devereux

16

stipulated that

> Devereux breached the legal duty of ordinary care owed to Tia McGee for her safety from sexual assault and that the breach of Devereux's legal duty contributed to Jimmy Singleterry's sexual assault of Tia McGee. Defendant also admits that Devereux is legally responsible for any harm which it proximately caused Tia McGee to suffer. And Devereux further admits that Tia McGee should receive some compensatory damages.

At the close of Taylor's evidence, Devereux moved for a directed verdict on the punitive damages, which was denied. In closing argument, Devereux's attorney argued that Devereux's "one mistake" of Mays leaving early "makes Devereux liable," but told the jurors they had to decide "apportionment, causation, and damages," arguing that they should assign more fault to Singleterry than to Devereux and that Taylor had not proven that all of the damages she requested were caused by the assault at Devereux as opposed to the other trauma McGee had suffered in her life before her time at Devereux. As to punitive damages, Devereux's attorney argued that Devereux had taken a number of steps to protect McGee, showing that there was not "an entire lack of any care whatsoever" provided.

17

On November 18, 2019, the jury found that McGee had suffered $10,000,000 in compensatory damages and that Devereux was 50 percent at fault and Singleterry was 50 percent at fault. The jury also found that Devereux was liable for punitive damages and for expenses of litigation because "they acted in bad faith in the underlying transaction" and "have been stubbornly litigious or caused unnecessary trouble or expense."[11] On November 19, additional evidence was presented on the issue of punitive damages, which included evidence of Devereux's financial situation. The jury found that Devereux was liable for $50,000,000 in punitive damages. The parties agreed to submit the question of the amount of expenses of litigation to the trial court, and the jury was dismissed.

On July 1, 2021, the trial court held a hearing on the issue of whether the statutory punitive damages cap in OCGA § 51-12-5.1 (g), which says that, with a few exceptions not applicable here, the

---

[11] The expenses of litigation issue was presented in two questions on the verdict form: if Devereux was liable for expenses because it "acted in bad faith in the underlying transaction" and if Devereux was liable for expenses because it had "been stubbornly litigious or caused unnecessary trouble and expense." The jury answered "Yes" to both questions.

18

amount of punitive damages "shall be limited to a maximum of $250,000.00," violated the Georgia Constitution, as well as on the appropriate measure of attorney fees. On February 8, 2022, the trial court entered three orders: one ruling that OCGA § 51-12-5.1 (g) did not violate the Georgia Constitution and thus reducing Taylor's punitive damages award to $250,000 in accord with the statute; one finding that Taylor was entitled to 40 percent of the jury's enforceable verdict as attorney fees; and one entering the final judgment requiring Devereux to pay $5,000,000 in compensatory damages (50 percent of $10,000,000) and $250,000 in punitive damages (the capped amount of punitive damages allowed under OCGA § 51-12-5.1 (g))—both nunc pro tunc to the date of the jury verdict, so that post-judgment interest ran from the date of the verdict—as well as $2,100,000 in attorney fees and $288,055.03 in litigation expenses.[12]

---

[12] The award of attorney fees and litigation expenses was not made nunc pro tunc, and the court's order made clear that post-judgment interest would run on these amounts from the court's February 8, 2022 order.

II. *Taylor's Appeal*

In her appeal, Taylor raises three arguments, all of which are focused on whether OCGA § 51-12-5.1 (g)—which the trial court applied to reduce the punitive damages she received from $50,000,000 to $250,000—violates the Georgia Constitution.[13] Taylor argues, as she did in the trial court, that the $250,000 limit is unconstitutional because it violates three rights protected by the Georgia Constitution: (1) the right to trial by jury, Ga. Const. of 1983 Art. I, Sec. I, Par. XI, (2) the guarantee of separation of powers, Ga. Const. of 1983 Art. I, Sec. II, Par. III, and (3) the guarantee of equal protection, Ga. Const. of 1983 Art. I, Sec. I, Par. II.

Before we address each of Taylor's challenges to OCGA § 51-12-5.1 (g) based on the Georgia Constitution, we will set out the burden that she must meet to prevail on any of them; the statute she challenges; and specific arguments pertaining to her claim for

---

[13] Taylor does not assert any argument on appeal that OCGA § 51-12-5.1 (g) violates the United States Constitution.

punitive damages.

A. *Taylor's Burden to Succeed on Her Constitutional Claims*

"Duly enacted statutes enjoy a presumption of constitutionality," and the party challenging the statute bears the burden to show that the statute "manifestly infringes upon a constitutional provision or violates the rights of the people." *Nestlehutt*, 286 Ga. at 732 (citation and punctuation omitted).

> [A]ll presumptions are in favor of the constitutionality of an Act of the legislature and [ ] before an Act of the legislature can be declared unconstitutional, the conflict between it and the fundamental law must be clear and palpable and this Court must be clearly satisfied of its unconstitutionality. Moreover, because statutes are presumed to be constitutional until the contrary appears, the burden is on the party alleging a statute to be unconstitutional to prove it.

*Barnhill*, 315 Ga. at 311 (citation and punctuation omitted). See also *Craig v. Maltbie*, 1 Ga. 544, 547 (1846) ("[W]hile it is a clear position, that if a legislative act oppugns a constitutional principle, the former must give way, and that in every such case it will be the duty of the court to declare the statute null, on the score of

21

repugnance.  Still, before the court [w]ill be justifiable in doing this, the opposition between the constitution and the law must be plain and palpable."); *Flint River Steamboat Co. v. Foster*, 5 Ga. 194, 209 (1848) ("It must be a very clear and  palpable case, which would warrant the Judiciary to exercise this delicate duty of declaring a law unconstitutional[.]"); *Carey v. Giles*, 9 Ga. 253, 258 (1851) ("If the constitutionality of the Acts [at issue] was the least doubtful, it would be our duty to carry them into effect.  To set them aside, their repugnancy to the Constitution should be most manifest. It is contrary to the practice and policy of this Court, as it should be of all others, rashly and lightly to pronounce void a solemn Act of the Government; the case must be clear to justify it.").

### B. *Taylor's Claim for Punitive Damages*

In the suit underlying this appeal, Taylor sought punitive damages under OCGA § 51-12-5.1—Georgia's punitive damages statute. Because each of Taylor's constitutional claims—particularly Taylor's claim based on the right to trial by jury in Georgia— requires not only an understanding of Georgia's historical right to

trial by jury, but also of modern punitive damages, we first turn to the punitive damages statute under which Taylor sought and was awarded damages.

> (1) *OCGA § 51-12-5.1 provides for punitive damages in certain circumstances and also places restrictions on some of those damage awards.*

Taylor moved for punitive damages under OCGA § 51-12-5.1, which was enacted in 1987, see Ga L. 1987, p. 915.[14] OCGA § 51-12-5.1 (a) explains that "[a]s used in this Code section, the term 'punitive damages' is synonymous with the terms 'vindictive damages,' 'exemplary damages,' and other descriptions of additional damages awarded because of aggravating circumstances in order to penalize, punish, or deter a defendant." Subsection (b) of the same statutory provision says

> Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the

---

[14] The statute has been amended three times since then, but that does not affect our analysis, because we are concerned with Georgia law as to punitive damages before 1798 and the law applicable to the punitive damages claim Taylor now brings.

presumption of conscious indifference to consequences.

And subsection (c) makes clear that: "Punitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant."

As noted above, Taylor alleges that subsection (g), which limits punitive damages awards for certain tort actions, violates the right to a trial by jury. Subsection (g) says:

> For any tort action not provided for by subsection (e) or (f) of this Code section in which the trier of fact has determined that punitive damages are to be awarded, the amount which may be awarded in the case shall be limited to a maximum of $250,000.00.

The subsection (e) carve-out applies to "tort case[s] in which the cause of action arises from product liability." And the subsection (f) carve-out makes clear that in tort cases other than products-liability cases, the $250,000 cap does not apply when an active tort-feasor acts (or fails to act) with "the specific intent to cause harm" or while under the influence of certain intoxicants. It says:

> In a tort case in which the cause of action does not arise from product liability, if it is found that the defendant acted, or failed to act, with the specific intent to cause

24

harm, or that the defendant acted or failed to act while under the influence of alcohol, drugs other than lawfully prescribed drugs administered in accordance with prescription, or any intentionally consumed glue, aerosol, or other toxic vapor to that degree that his or her judgment is substantially impaired, there shall be no limitation regarding the amount which may be awarded as punitive damages against an active tort-feasor but such damages shall not be the liability of any defendant other than an active tort-feasor.[15]

As these statutory provisions show, the punitive damages available today under OCGA § 51-12-5.1: (1) are awarded "solely to punish, penalize, or deter," and (2) may be awarded only if the defendant's actions showed a state of mind indicating some extra degree of culpability, such as "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1 (b), (c). Punitive damages may not be awarded under OCGA § 51-12-5.1 when the defendant's actions sound only in negligence; mere negligence, or even gross negligence, is not sufficient. See *MDC Blackshear, LLC v. Littell*, 273 Ga. 169, 173

---

[15] It is undisputed that subsections (e) and (f) do not apply to this case.

25

(537 SE2d 356) (2000).  However, intentional misconduct is not required either; acting with an "entire want of care" and "conscious indifference to consequences" can be enough.  See OCGA § 51-12-5.1 (b); *Tyler v. Lincoln*, 272 Ga. 118, 120 (527 SE2d 180) (2000) ("A conscious indifference to consequences relates to an intentional disregard of the rights of another.  Wilful and intentional *misconduct* is not essential.") (citations and punctuation omitted, emphasis in original).

> (2) *Taylor's claim for punitive damages relies on her allegation that Devereux acted with an "entire want of care."*

At trial, Taylor focused on the "entire want of care" state of mind found in OCGA § 51-12-5.1 (b), arguing to the jury that Devereux "just didn't care" and acted with an "entire want of care" and "a total lack of disregard."  Taylor made no claim at trial that her claim fit under the carve-out to the punitive damages cap in OCGA § 51-12-5.1 (f) for claims that "the defendant acted, or failed to act, with the specific intent to cause harm," and she did not contend at trial that Devereux engaged in any intentional

26

misconduct that led to McGee's sexual assault; rather, she argued that Devereux's "entire want of care" toward protecting McGee allowed McGee to be sexually assaulted.[16]

III. *Right to Trial By Jury*

We now turn to Taylor's primary argument: that the portion of OCGA § 51-12-5.1 (g) that establishes a $250,000 cap on the amount of punitive damages a plaintiff may recover violates the Georgia Constitution's right to trial by jury.[17]

A. *The Georgia Constitution's Right to Trial by Jury*

The Georgia Constitution of 1983 provides: "The right to trial

---

[16] Specifically, even to the extent Taylor alleged in her complaint that Devereux was liable for punitive damages based on acting with states of mind other than an "entire want of care," she did not make any such argument to the jury.

[17] We note that on this question we were assisted by several amici curiae who filed briefs in this case, and whom we thank: American Medical Association and Medical Association of Georgia; Child USA and National Center for Victims of Crime; Georgia Defense Lawyers Association; Georgia Trial Lawyers Association and American Association for Justice; Georgians for Lawsuit Reform; Professors Anthony J. Sebok and John C. Goldberg; and United States Chamber of Commerce, Georgia Chamber of Commerce, and American Tort Reform Association. We also thank the Attorney General of Georgia, who presented oral argument as amicus curiae in addition to filing a brief.

by jury shall remain inviolate, except that the court shall render judgment without the verdict of a jury in all civil cases where no issuable defense is filed and where a jury is not demanded in writing by either party." Ga. Const. Art. I, Sec. I, Par. XI (a).

The right to a jury trial has been understood as an important right in Georgia since the State's founding. See, e.g., *Flint River*, 5 Ga. at 206 (describing, in 1848, the right to a jury trial as "one of the great elements, the greatest characteristic of free government"); *Craig*, 1 Ga. at 546 (explaining, in 1846, that the Court would not "wish to curtail or abridge the right of trial by jury, believing, as we do, . . . that the more it is searched into and understood, the more it is sure to be valued," and describing the right to a jury trial as a "principal bulwark of English and American liberties"). Indeed, a version of this jury-trial provision has been included in almost every Georgia Constitution since 1777, with "very similar" language. *De Lamar v. Dollar*, 128 Ga. 57, 59 (57 SE 85) (1907).[18] And critical to

---

[18] The provision was not included in the Constitutions of 1861 and 1865, see *De Lamar*, 128 Ga. at 59, a point neither party in this case raises on appeal.

our analysis in this case, is that for almost 175 years, this Court has consistently interpreted the Georgia Constitution's right to a jury trial as meaning that "[t]he people of this State . . . are entitled to the trial by jury, *as it was used in the State prior to the Constitution of [17]98.*" *Tift v. Griffin*, 5 Ga. 185, 189 (1848) (emphasis in original). See also *Flint River*, 5 Ga. at 207-208 (explaining, in 1848: "The provision in our State Constitution, that trial by jury, as heretofore used, shall remain inviolate, means that it shall not be taken away, as it existed in 1798, when the instrument was adopted, *and not that there must be a jury trial in all cases.*") (emphasis in original); *Williams v. Overstreet*, 230 Ga. 112, 116 (195 SE2d 906) (1973) ("'The provision in the Constitution of Georgia, that 'trial by jury, as heretofore used, shall remain inviolate' means, that it shall not be taken away in cases where it existed when that instrument was adopted in 1798; and not that there must be a jury in all cases.'") (citing *Flint River*, 5 Ga. at 195); *Benton v. Georgia Marble Co.*, 258

We note, however, that—as discussed further below—the Georgia Constitution's jury-trial provision has long been interpreted as preserving the jury trial right as it existed in 1798. See, e.g., *Nestlehutt*, 286 Ga. at 733.

29

Ga. 58, 66 (365 SE2d 413) (1988) ("It has been held that the Georgia Constitution (Art. I, Sec. I, Par. XI) guarantees the right to a jury trial only with respect to cases as to which there existed a right to jury trial at common law or by statute at the time of the adoption of the Georgia Constitution in 1798."); *Nestlehutt*, 286 Ga. at 733 ("It is well established that Art. I, Sec. I, Par. XI (a) 'guarantees the right to a jury trial only with respect to cases as to which there existed a right to jury trial at common law or by statute at the time of the adoption of the Georgia Constitution in 1798.'") (citing *Benton*, 258 Ga. at 66).[19]

---

[19] It is not entirely clear why these cases pointed to the Georgia Constitution of 1798 as the touchstone of our Constitution's jury-trial right, rather than looking to Georgia's earlier Constitutions from 1777 or 1789, which contained similar provisions protecting the right to a jury trial.

Regarding the 1798 date, we note that two of the cases cited above, *Tift* and *Flint River,* were decided when the Constitution of 1798 was the operative Constitution. We also note that the jury-trial provision in the Constitution of 1798 "contains the words, 'as heretofore used in this State,' which do not appear in the other instruments." *De Lamar*, 128 Ga. 59. See also Ga. Const. of 1798 Art. IX, Sec. V. Although no reported case expressly focuses on the meaning of this language, it is possible that it implicitly incorporated all of Georgia's prior history and practice with respect to jury trials, including the years before 1798.

The dissenting opinion suggests that *Nestlehutt* (and all the parties and amici in this case) were wrong to follow our line of decisions identifying 1798 as the relevant date for determining the scope of the right to trial by jury. The

The consequence of this well-settled 1798 cutoff is significant. If the type of claim at issue in this case is one as to which there existed a right to trial by jury as of 1798, our Constitution's right to a trial by jury applies in the same way the right applied in 1798. For other types of claims, the right does not attach. Accordingly, we look to Georgia law from 1798 and earlier in evaluating the scope of

dissent does not, however, engage in any meaningful stare decisis analysis to show that we should overturn *Nestlehutt* or the cases it relies on it with respect to the key date for evaluating the right to trial by jury under the Georgia Constitution.

What is more, the dissenting opinion contends that we do not even need to engage in a stare decisis analysis before overruling *Nestlehutt* and other cases setting 1798 as the key date because stare decisis is not required to "correct[] our identification of Georgia's first constitution." Dissent Op. 6 n.5. But neither *Nestlehutt* nor the opinions cited above purport to identify the 1798 Constitution as Georgia's first Constitution—the error that the dissenting opinion appears to identify in *Nestlehutt* and *Benton*. It is true that a few other cases say that we should look to Georgia's "first Constitution" in analyzing the scope of our State's constitutional right to a jury, but these cases are ambiguous about which Constitution that is. See *Metropolitan Cas. Ins. Co. of N.Y. v. Huhn*, 165 Ga. 667, 672 (142 SE 121) (1928) (explaining that "[i]n a number of cases in this state it has been held that in civil actions the right of jury trial exists only in those cases where the right existed prior to the first Constitution," but not clarifying the date of that Constitution); *Strange v. Strange*, 222 Ga. 44, 45 (148 SE2d 494) (1966) (noting "an unbroken line of decisions" from this Court holding "that in civil actions the right of a jury trial exists only in those cases where the right existed prior to the first Georgia Constitution," and citing *Metropolitan*). We need not resolve this mystery today, however, given that no one has asked us to reconsider our precedents setting the key date at 1798. Accordingly, we will follow those precedents.

Georgia's right to trial by jury. That law includes not only early Georgia cases and statutes, but also the English common law of 1776, which in 1784 was adopted as the law of Georgia. See *Nestlehutt*, 286 Ga. at 733 ("[T]he initial step in our analysis must necessarily be an examination of the right to jury trial under late eighteenth century English common law."); OCGA § 1-1-10 (c) (1) (adopting in Georgia's new code the act "adopting the common laws of England as they existed on May 14, 1776," which was approved in Georgia on February 25, 1784). See also *Tift*, 5 Ga. at 191 ("From the earliest times, the trial by jury has descended to us, through usage in England – in our Provincial state, and after the organization of our State Government, subject to this limitation.").

We recognize that even to the extent the Georgia constitutional provision on jury trials "froze" the scope of the inviolate right to a jury trial as it existed in 1798, it did not freeze the law completely. "New forums may be erected, and new remedies provided, accommodated to the ever shifting state of society." *Flint River*, 5 Ga. at 208. In other words, the General Assembly is authorized to

32

create new statutory causes of action that did not exist before 1798, and is likewise authorized to create new or additional remedies for those causes of action. Those new remedies, however, do not automatically come with a constitutional right to a trial by jury. The 1966 case of *Strange v. Strange*, 222 Ga. 44 (148 SE2d 494) (1966), illustrates this dynamic. There, a divorced mother brought a claim for child support in 1965 under the Uniform Reciprocal Enforcement of Support Act and the trial court, acting without a jury, entered a judgment ordering the father to pay future child support. *Strange*, 222 Ga. at 44-45. After the father appealed and complained that his right to a jury had been violated, this Court held that the father did not have a constitutional right to a jury trial. Id. at 45, 47. We explained that because the mother, "under the factual situation of this case, could not bring a common law action against the father of the minor children" for future child support, the mother's claim was "wholly of statutory origin and unknown to the common or statutory law of England prior to our first Constitution." Id. at 47. Similarly, in *Williams*, we held that "there is no constitutional right to a trial

33

by jury in an equity case" because the use of juries in equity cases "originated in this State in the Judiciary Act of 1799." 230 Ga. at 115-116.

Because Georgia's constitutional jury trial right protects only those rights to a jury trial that existed in Georgia in 1798, to determine whether a party has a right to a jury trial for a particular claim, we must determine whether such a claim existed and was decided by a jury in Georgia in 1798.

## B. Nestlehutt*'s Analytical Framework*

In *Nestlehutt,* this Court applied the well-established analytical framework described above to evaluate a contention that a statutory cap on non-economic damages in medical malpractice claims violated Georgia's constitutional right to trial by jury. See 286 Ga. at 732-738. In that case, we first considered whether in Georgia in 1798, the underlying claim of medical malpractice existed and concluded that it did, such that the right to trial by jury applied to the claim. See id. at 734 ("Given the clear existence of medical negligence claims as of the adoption of the Georgia Constitution of

34

1798, we have no difficulty concluding that such claims are encompassed within the right to jury trial[.]"). We then considered the scope of the jury-trial right that applied to medical-negligence claims in or before 1798, focusing on the particular aspect of the historical jury trial that the plaintiff alleged was restricted by the modern statute in question. See id. at 733-735. There, the key questions were whether Georgia juries in 1798 determined damages in tort cases involving medical negligence, and whether those damages included the non-economic damages that were sought by the plaintiff (and restricted by a modern statute) in *Nestlehutt*. See id. We concluded that the plaintiff made those showings, explaining that it "ha[d] been the rule from the beginning of trial by jury" that the "determination of damages rests peculiarly within the province of the jury," and that "[n]oneconomic damages have long been recognized as an element of total damages in tort cases, including those involving medical negligence." Id. at 735 (citation and punctuation omitted). In other words, the claim that was restricted by the statute—a claim for non-economic damages in a tort case

35

involving medical negligence—was within the scope of the constitutional right to trial by jury in Georgia.  See id. at 735  ("[W]e conclude that at the time of the adoption of our Constitution of 1798, there did exist the common law right to a jury trial for claims involving the negligence of a health care provider, with an attendant right to the award of the full measure of damages, including noneconomic damages, as determined by the jury.").

Then, in examining a statutory cap on damages against the backdrop of this constitutional right to a jury trial, we held that a legislatively-imposed limit on the jury's award violated the plaintiff's right to trial by jury because "the right to a jury trial includes the right to have a jury determine the *amount* of damages, if any, awarded to the plaintiff." Id. at 734 (citation and punctuation omitted, emphasis in original).  We thus concluded that the statutory limit on non-economic damages "clearly nullifie[d] the jury's findings of fact regarding damages and thereby undermine[d]

36

the jury's basic function."  Id. at 735.[20]

Applying that same framework of analysis to the case before us yields the following: if Taylor can show that at least one of her claims of liability against Devereux existed in Georgia in 1798 and that the kind of punitive damages she seeks were within the scope of her right to a jury trial on that claim, then the legislatively-imposed damages cap set forth in OCGA § 51-12-5.1 (g) violates her right to a trial by jury under the Georgia Constitution.  If Taylor cannot make that showing, then she will not carry her burden of showing that the constitutional right to trial by jury extended to her claim for punitive damages.  As we explain more below, Taylor's claim fails because she cannot show that a Georgia jury in 1798 would have been authorized to award the kind of punitive damages she seeks

---

[20] Although neither party has asked us to reconsider *Nestlehutt*, amicus curiae the Attorney General of Georgia—without engaging in a stare decisis analysis—has asked that we overrule the portion of *Nestlehutt* holding that a right to a jury trial has "an attendant right to the award of the full measure of damages . . . as determined by the jury," 286 Ga. at 735, arguing that the right to a jury trial protects only the procedural "right to have a *trial* by jury," and not necessarily the right for the jury to be able to award certain types of damages or to receive any or all of the damages awarded by the jury.  We decline the invitation.

today based on a defendant acting with an "entire want of care."

C. *Limitations of* Teasley v. Mathis *and* State v. Moseley *in Addressing Georgia's Constitutional Jury-Trial Right*

Before we apply the *Nestlehutt* framework to Taylor's claims, we note that Devereux and the special concurrence assert that we need not engage in this analysis and should instead rely on two of our prior cases: *Teasley v. Mathis*, 243 Ga. 561 (255 SE2d 57) (1979), and *State v. Moseley*, 263 Ga. 680 (436 SE2d 632) (1993), which held that certain legislatively-imposed limitations on punitive damages did not violate Georgia's constitutional right to a jury trial. See *Teasley*, 243 Ga. at 564; *Moseley*, 263 Ga. at 681. As an initial matter, *Teasley* and *Moseley* addressed challenges to different statutory provisions than the cap at issue here. *Teasley* addressed a jury-trial-right challenge to the complete elimination of punitive damages in the "no fault statute" for car accident cases where there was no "serious injury," 243 Ga. at 561, and *Moseley* addressed a jury-trial-right challenge to OCGA § 51-12-5.1 (e) (2)'s apportionment of 75 percent of a punitive damages award to the

38

State of Georgia in a products liability case, 263 Ga. at 680-681. And although it may seem like *Teasley* and *Moseley* are similar to this case because those cases, like this case, deal with a plaintiff's constitutional challenge to a legislatively-imposed restriction on punitive damages, the reasoning of those cases is cursory, fatally incomplete, and does not withstand our later holding in *Nestlehutt*.

Indeed, in *Nestlehutt*, we noted that both *Teasley* and *Moseley* "reserv[ed] only cursory analysis to the right to jury trial issue, which was summarily resolved in reliance on precedent that did not address the right to jury trial at all." 286 Ga. at 736. Specifically, we rejected the plaintiff's constitutional challenge in *Teasley* in only two sentences that provided no express analysis of the right to a jury trial under the Georgia Constitution:

> The legislature, however, may modify or abrogate common law rights of action (*Silver v. Silver*, 280 U.S. 117 (50 S.Ct. 57, 74 L.Ed. 221) (1929); *Arizona Employers' Liability Cases*, 250 U.S. 400 (39 S.Ct. 553, 63 L.Ed. 1058) (1918); *Munn v. Illinois*, 94 U.S. 113 (24 L.Ed. 77) (1876)), as well as statutorily created rights, *Kelly v. Hall*, [191 Ga. 470 (12 S.E.2d 881) (1941)]. Therefore, eliminating the right to sue for exemplary damages where there are no serious injuries is well within the province of the

39

legislature and Teasley's constitutional challenge on this ground must also fail.

243 Ga. at 564. Notably, the only citations included in this sparse analysis were citations to three United States Supreme Court cases and one case from this Court, none of which addressed the right to a jury trial under the Georgia Constitution. See *Silver* 280 U.S. at 122(considering whether a Connecticut law violated the "equal protection of the laws guaranteed by the Fourteenth Amendment" to the United States Constitution); *Arizona Copper Co.*, 250 U.S. at 417 (considering whether an Arizona statute violated the Fourteenth Amendment to the United States Constitution); *Munn*, 94 U.S. at123 (considering whether an Illinois statute violated provisions in the United States Constitution regulating commerce and the Fourteenth Amendment); *Kelly*, 191 Ga. at 472-473 (considering whether taking away the right to punitive damages violated "Federal and State provisions against the deprivation of property without due process of law").

*Moseley*'s analysis on this issue was similarly brief, rejecting

the argument that the legislature could not apportion 75 percent of the plaintiffs' punitive damage award to the State by saying:

> The Moseleys, in essence, are asking this Court to rule that Art. 1, Sec. 1, Par. 11 prohibits the General Assembly from abrogating or circumscribing common law or statutory rights of action. We have held, however, that that provision of the Constitution has no such effect, *Teasley v. Mathis*, 243 Ga. [at 564]; see also, *Georgia Lions Eye Bank, Inc. v. Lavant*, 255 Ga. 60, 61-62 (335 S.E.2d 127) (1985), and we decline to part from that rule in this case.

263 Ga. at 681. In other words, *Moseley* relied on *Teasley*'s unsupported reasoning and cited yet another case addressing a due process challenge—not a challenge to the right to trial by jury. See *Georgia Lions Eye Bank*, 255 Ga. at 60-61.

The sparse analysis in both cases is fatally incomplete not only because the opinions do not expressly consider the scope of the constitutional jury-trial right, but also because they held that the Georgia General Assembly could modify "common law rights of action," without acknowledging the foundational principle that the legislature *cannot* abrogate constitutional rights. See Ga. Const. of 1983, Art. III, Sec. VI, Par. I ("The General Assembly shall have the

41

power to make all laws *not inconsistent with this Constitution*, and not repugnant to the Constitution of the United States, which it shall deem necessary and proper for the welfare of the state.") (emphasis supplied).  See also *Nestlehutt*, 286 Ga. at 736 (although "the Legislature has authority to modify or abrogate the common law," it may not "abrogate *constitutional* rights that may inhere in common law causes of action") (emphasis in original).[21]  For this reason, the summary conclusions contained in *Teasley* and *Moseley* noted above were necessarily rejected by this Court in *Nestlehutt*, insofar as *Teasley* and *Moseley* failed to recognize the limit the Georgia Constitution may put on the legislature's ability to modify causes of action.  As *Nestlehutt* held, when Georgia's constitutional right to a jury trial applies, the legislature cannot infringe on that

---

[21] Notably, this foundational principle was recognized by a case this Court cited in *Moseley*: *Georgia Lions Eye Bank*, which states that

> Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, *unless prevented by constitutional limitations.*

255 Ga. at 61-62 (emphasis supplied).

42

right.  See *Nestlehutt*, 286 Ga. at 736.  We agree with the bedrock principle, articulated in *Nestlehutt*, that the legislature may not "abrogate *constitutional* rights" that may inhere in common-law causes of action.  Id. (Emphasis in original).[22]  To the extent *Teasley* and *Moseley* conflict with that well-established principle, or with *Nestlehutt*'s holding on that point, we are bound to follow *Nestlehutt*'s holding, and not those earlier decisions.  See *White v. State*, 305 Ga. 111, 122 n.10 (823 SE2d 794) (2019) ("When a high court finds discordant opinions among its own horizontal precedents, the court generally follows its decision in the most recent case, which must have tacitly overruled any truly inconsistent holding.") (citation and punctuation omitted).[23]

_____

[22] Notably, although the dissenting opinion disagrees with our ultimate conclusion—based on the application of the *Nestlehutt* framework—that the punitive damages Taylor seeks here are not within the scope of the right of trial by jury guaranteed by the Georgia Constitution, the dissenting opinion nonetheless agrees that *Teasley* and *Moseley* are flawed insofar as they "failed to recognize the limits the constitutional right to trial by jury puts on the scope of the General Assembly's authority." Dissent Op. at 22 n.16.

[23] Moreover, contrary to the special concurrence's assertion, applying *Nestlehutt*'s reasoning in this case does not "extend" *Nestlehutt*, because its reasoning was not limited to a specific type of damages; it set forth an

D. *Applying* Nestlehutt's *Analytical Framework to Taylor's Claims*

Turning to the framework laid out in *Nestlehutt,* we specifically consider whether any of Taylor's underlying claims existed in Georgia in 1798 and whether the scope of a jury trial on that claim includes damages to punish based on Taylor's contention that Devereux acted with an entire want of care. Because we have identified no pre-1798 Georgia case or statute relevant to the questions before us—and the parties have offered none—we focus on the claims and types of damages that were available in England in and before 1776. See *Nestlehutt,* 286 Ga. at 733 ("Thus, the initial step in our analysis must necessarily be an examination of the right to jury trial under late eighteenth century English common law.").

---

analytical framework for interpreting Georgia's constitutional right to trial by jury and how that right may limit the power the legislature otherwise holds. Additionally, the special concurrence asserts that *Nestlehutt* holds that its "analytical framework did not apply to statutory limits on punitive damages." We do not agree. *Nestlehutt* factually distinguished *Teasley* and *Moseley* on the ground that they dealt with punitive damages, whereas *Nestlehutt* addressed non-economic damages. It did not hold that the analytical framework to determine if a constitutional jury-trial right attaches did not apply at all to punitive damages.

44

See also OCGA § 1-1-10 (c) (adopting in Georgia's new code the act "adopting the common laws of England as they existed on May 14, 1776").[24]

> (1) *At least one of Taylor's underlying claims— premises liability—existed in England in 1776.*

We begin, as we did in *Nestlehutt*, by considering whether the type of underlying claim of liability (there, medical malpractice) was available in Georgia in 1798. See 286 Ga. at 733-734. As noted above, Taylor brought a number of claims of liability against Devereux, including a premises liability claim under OCGA § 51-3-1, and Devereux conceded that it "breached the legal duty of ordinary care owed to Tia McGee for her safety from sexual assault" and that the breach contributed to McGee's sexual assault.[25]

---

[24] As we noted in *Nestlehutt*, "Because there is only a sparse record of reported Georgia cases prior to the publication of the first volume of the Georgia Reports in 1846, Georgia precedent is of limited utility in ascertaining the extent of the jury trial right as of 1798." 286 Ga. at 733 n.3.

[25] Under OCGA § 51-3-1, "[w]here an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." Devereux does not argue that it was not liable for

Because the jury rendered a general verdict on compensatory damages and was not asked to determine which theory of liability was the basis for its awards, we need only determine at this step if one of Taylor's underlying claims was available in Georgia in 1798.

Taylor contends that at common law in England, defendants could be liable for a failure to keep their premises safe for invitees, and Devereux does not argue otherwise on appeal. Taylor appears to be correct. See, e.g., *Calye's Case*, 77 Eng. Rep. 520, 522 (1583) ("[T]he inkeeper is bound in law to keep [his guest's goods and chattels] safe without any stealing or purloining[.]"); *Gelley v. Clerk*, 79 Eng. Rep. 164, 164-165 (1606) (explaining that an innkeeper may be sued for failing to protect a guest's horse kept at the inn). See also *Rider v. Smith*, 100 Eng. Rep. 848, 848 (1790) (holding that the plaintiff could bring an action against the defendant for not repairing a road on the defendant's ground that the plaintiff was entitled to use); *Payne v. Rogers*, 126 Eng. Rep. 590, 590 (1794) ("If

_____

premises liability. Thus, the question of whether Devereux properly could have been found liable for a violation of OCGA § 51-3-1 is not at issue on appeal.

46

the owner of the house is bound to repair it, he . . . is liable to an action on the case for an injury sustained by a stranger from the want of repair."); *Brock v. Copeland*, 170 Eng. Rep. 328, 328-329 (1794) ("[W]here there is either a public way, or the owner of a mischievous animal suffers a way over his close to be used as a public one, if he keeps such animal in his close, he shall answer for any injury any person may sustain from it.").[26]

Because Taylor has shown that at least one of the underlying claims of liability supporting her punitive damages claim was available in pre-1776 England, we proceed to the next step in *Nestlehutt*'s analytical framework: determining whether the scope of the right to a jury trial on this claim included the punitive damages Taylor seeks—i.e., damages to punish Devereux for acting with an "entire want of care." We address this question by considering each of the pre-1776 English cases Taylor relies on, particularly focusing

---

[26] We acknowledge that these three cases were decided after 1776, but at a minimum they provide some additional evidence that similar cases could have been brought in Georgia at the time these cases were decided.

on six key English cases.[27]  We conclude that the cases Taylor cites show that English juries in 1776 could award damages designed to punish a defendant, or what we will call "punishment damages," in certain circumstances—but that Taylor offers no evidence that English juries in 1776 or Georgia juries in 1798 could award punishment damages for a claim that a defendant acted with an "entire want of care," and has therefore failed to show that the punitive damages she seeks are within the scope of Georgia's constitutional right to a jury trial.

> (2) *Taylor cites six cases in which English juries awarded damages to punish the defendant for claims of intentional misconduct.*

As discussed above, Taylor argued that Devereux acted with an "entire want of care"; on that basis, she sought—and the jury awarded—punitive damages under Georgia's modern punitive

---

[27] These cases are discussed in detail throughout subsection (2) of this division.  We address the other pre-1776 English cases cited by Taylor in subsection (2) (c) of this division and footnote 40 below.

damages statute, OCGA § 51-12-5.1.[28] Taylor cites six cases, each discussed below, that she says are examples of pre-1776 English juries awarding the kind of punishment damages she sought and received from the jury.[29] We thus consider whether these cases show that juries awarded damages to punish, penalize, or deter a defendant based on a defendant acting with an "entire want of care."

In discussing these cases, we bear in mind that, as noted above, the term "punitive damages" as used today in OCGA § 51-12-5.1 "is synonymous with the terms 'vindictive damages,' 'exemplary damages,' and other descriptions of additional damages awarded because of aggravating circumstances in order to penalize, punish, or deter a defendant." Id. (a). Thus, when considering whether a

---

[28] As previously noted, punitive damages under OCGA § 51-12-5.1 are awarded "to punish, penalize, or deter a defendant," and they are awarded only for claims that the defendant acted with "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1 (b), (c).

[29] We acknowledge that in England around the time these six cases were decided, "only a small proportion of decided cases was reported." *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 423 (114 SCt 2331, 129 LE2d 336) (1994) (noting that in "the year *Beardmore* was decided, only 16 Common Pleas cases are recorded in the standard reporter").

1776 English jury could award damages like the kind Taylor sought with her claim for "punitive damages" under OCGA § 51-12-5.1, the key question is not the exact nomenclature of the damages available at English common law, but rather the substantive purpose of the damages—whether they were awarded "because of aggravating circumstances in order to penalize, punish, or deter a defendant." OCGA § 51-12-5.1 (a). Notably, the term "exemplary damages," a term listed in OCGA § 51-12-5.1 (a) as "synonymous" with "punitive damages," is used in some of the early English cases discussed below. Id. While the term "exemplary damages" alone is not dispositive of whether these damages were damages awarded "to penalize, punish, or deter a defendant" like damages under OCGA § 51-12-5.1 (a) are, we consider the use of the term as part of the description of the damages in determining their purpose.

We turn now to the cases.[30] In *Huckle v. Money*, 95 Eng. Rep.

---

[30] We note that Taylor has not cited any pre-1776 English or pre-1798 Georgia cases addressing claims of premises liability, or any of the other claims she raises, where punishment damages were awarded. However, the following cases are instructive on whether juries could award damages to punish defendants and the types of claims that would support such damages in 1798.

50

768 (1763), a claim for "[t]respass, assault, and imprisonment," the jury awarded "exemplary damages" of £300. Id. at 768. There, the plaintiff, a "journey-man printer," "was taken into custody by the defendant (a King's messenger) upon suspicion of having printed the *North Briton*, Number 45," and kept in custody "about six hours," but the defendant "used him very civilly by treating him with beef-steaks and beer, so that he suffered very little or no damages." Id. at 768. The warrant used to justify the plaintiff's seizure was granted by the Secretary of State "without any information or charge laid before the Secretary of State, . . . and without naming any person whatsoever in the warrant." Id. After the defendant argued that the jury had given excessive damages, Chief Justice Pratt explained that "the personal injury done to [the plaintiff] was very small, so that if the jury had been confined by their oath to consider the mere personal injury only," the jury's award would have been too high. Id. However, the Chief Justice held that because of the magistrate's "exercising arbitrary power, violating Magna Charta, and attempting to destroy the liberty of the kingdom," he

thought the jury had "done right in giving exemplary damages."  Id. at 769.

In *Wilkes v. Wood*, 98 Eng. Rep. 489 (1763), a claim of "trespass, for entering the plaintiff's house, breaking his locks, and seizing his papers" (again related to the *North Briton*), the jury was told it could award "damages for more than the injury received" and awarded £1,000.  See id. at 489-499.  There, Wood and "several of the King's messengers, and a constable," entered Wilkes's house, broke his locks, and seized his papers based "upon a bare suspicion of a libel by a general warrant, without name of the person charged."  Id. at 490.  Chief Justice Pratt instructed the jury:

> I have formerly delivered it as my opinion on another occasion, and I still continue of the same mind, that a jury have it in their power to give damages for more than the injury received.  Damages are designed not only as a satisfaction to the injured person, but likewise as a punishment to the guilty, to deter from any such proceeding for the future, and as a proof of the detestation of the jury to the action itself.

Id. at 498.

Damages of £1,000 were also awarded and upheld in a similar

case for a claim of "trespass and false imprisonment" after the defendants entered the plaintiff's house, searched his private papers, and confined him for six and a half days based on an illegal warrant. See *Beardmore v. Carrington et al.,* 95 Eng. Rep. 790, 790-791, 793 (1764). The judge who presided over the case thought the argument that "the jury were to measure the damages by what the defendant had suffered by this trespass and six days and an half imprisonment" to be a "gross absurdity," and on appellate review, the court concluded that the jury's high damages were not excessive, describing the defendant's actions as "an unlawful power assumed by a great minister of State" and "concern[ing] the liberty of every one of the King's subjects." Id. at 793-794.

Similarly, in *Grey v. Grant*, 95 Eng. Rep. 794 (1764), a claim for "assault and battery," the jury awarded the plaintiff "exemplary damages" of £200 after the defendant stole the turtle the plaintiff shipped in from the West Indies, refused to return or pay for it because "he had invited some friends to dine with him upon it," "shoved the plaintiff out of his house with his elbow," and gave the

plaintiff "a blow upon the face, which caused a black eye." Id. at 794-795. The defendant argued that the amount of damages awarded by the jury was too high, but the court held that "when a blow is given by one gentleman to another, a challenge and death may ensue, and therefore the jury have done right in giving exemplary damages." Id. at 795.

And in *Benson v. Frederick*, 97 Eng. Rep. 1130 (1766), a claim based on the defendant "order[ing] [an] innocent man to be flogged," the jury awarded £150 after the defendant ordered that the plaintiff be whipped because he was angry at the military official who had granted the plaintiff furlough. Id. at 1130. The defendant argued that the jury's damages were too high, but the court held that it "was not dissatisfied with the verdict," explaining that the plaintiff, "though not much hurt indeed, was scandalized and disgraced" and "the defendant had acted very arbitrarily, and was well able to pay for it." Id.

Finally, in *Tullidge v. Wade*, 95 Eng. Rep. 909 (1769), a claim of "trespass" and "assault," the court held that the £50 the jury

awarded were not excessive in a case where the defendant "with force and arms made an assault upon A.B. daughter and servant of the plaintiff, and got her with child." Id. at 909. The Chief Justice explained: "Actions of this sort are brought for example's sake; and although the plaintiff's loss in this case may not really amount to the value of twenty shillings, yet the jury have done right in giving liberal damages." Id. He also noted that if A.B. brought another action against the defendant "for the breach of promise of marriage, so much the better; he ought to be punished twice." Id.[31]

---

[31] In addition to these cases, Taylor points out that there are references to "exemplary" damages in William Blackstone's *Commentaries on the Laws of England*. See, e.g., *Rouse v. State*, 4 Ga. 136, 145 (1848) (looking to Blackstone's *Commentaries* to determine "[w]hat was the trial by jury, as used in this State in 1798, the time when the Constitution was adopted"). Blackstone explained that when "Adultery, or criminal conversation with a man's wife" is "considered as a civil injury, (and surely there can be no greater) the law gives satisfaction to the husband for it by an action of trespass *vi et armis* against the adulterer, wherein the damages recovered are usually very large and exemplary." 3 William Blackstone, *Commentaries on the Laws of England* 139 (1772). See also Black's Law Dictionary (11th ed. 2019) (defining "vi et armis" as "[b]y or with force and arms"). Likewise, Blackstone noted with respect to nuisance claims brought in the form of action called an "action *on the case*": "[E]very continuance of a nu[i]sance is held to be a fresh one; and therefore a fresh action will lie, and very exemplary damages will probably be given, if, after one verdict against him, the defendant has the hardiness to continue it." Blackstone at 220 (emphasis in original). Although these are only brief references, they support the idea that punishment damages existed in

(a) *Taylor offers evidence that juries were the arbiters of the large damages awarded in pre-1776 English cases.*

In all six of the pre-1776 English cases Taylor relies on, the jury decided the damages award—which suggests that the question of damages was a jury question, and one in which English courts were hesitant to meddle. See *Beardmore,* 95 Eng. Rep. at 793 ("We desire to be understood that this Court does not say, or lay down any rule that there never can happen a case of such excessive damages in tort where the Court may not grant a new trial; but in that case the damages must be monstrous and enormous indeed, and such as all mankind must be ready to exclaim against, at first blush."); *Wilkes,* 98 Eng. Rep. at 498 (instructing the jury that it "ha[d] it in their power to give damages for more than the injury received"). See also 3 William Blackstone, *Commentaries on the Laws of England* 397 (1772) ("[W]here damages are to be recovered, a jury must be called in to assess them; unless the defendant, to save charges, will

England before 1776 and that juries were authorized to award them in at least some cases. See footnote 35 for a discussion about "trespass *vi et armis*" and "action on the case."

56

confess the whole damages laid in the declaration[.]"); *Nestlehutt*, 286 Ga. at 734 (citing Blackstone, among other sources, to show that the jury determined damages). Thus, consistent with *Nestlehutt*, Taylor has shown that in pre-1776 England, juries generally determined the amount of damages and were empowered to award large amounts of damages in certain circumstances. The next question we consider is whether those large damages were, like modern punitive damages, damages designed to punish the defendant.[32]

> (b) *Taylor has shown that in pre-1776 English cases, at least some damages were awarded to punish.*

We now evaluate whether the six English cases Taylor cites involved juries awarding the *kind of damages* Taylor seeks in her suit, i.e., damages to punish. Devereux acknowledges that the six

---

[32] Devereux argues that whether to award punitive damages at common law was not a jury question because *Nestlehutt* described punitive damages as "not really a 'fact' 'tried' by the jury." 286 Ga. at 736 (citation and punctuation omitted). However, this statement in *Nestlehutt* was dicta, and to the extent it can be read as indicating that punishment damages were not a component of the damages decided by a jury in pre-1776 England or pre-1798 Georgia, we disapprove it.

cases cited by Taylor show examples of juries giving large damages awards, but Devereux argues that the damages the English juries in those cases awarded are not equivalent to the punitive damages Taylor seeks in this case because the former were not damages designed to punish a defendant. See OCGA § 51-12-5.1 (c) ("Punitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant."). Instead, Devereux argues that no punishment damages existed in pre-1776 England, and that the damages that seemed disproportionately high compared to the injury awarded in the cases discussed above were really only compensation for non-economic damages. See Simon Greenleaf, 2 *Treatise on the Law of Evidence* 243 (16th ed. 1899) (asserting that "the terms 'exemplary damages,' 'vindictive damages,' 'smart-money,' and the like" "seem to be intended to designate in general those damages only which are incapable of any fixed rule, and lie in the discretion of the jury; such as damages for mental anguish, or personal indignity and disgrace, etc., and these, so far only as the sufferer is himself affected"). See also *Smith v.*

58

*Overby*, 30 Ga. 241, 248 (1860) (explaining that in cases such as an assault and battery, "the injury is to [the plaintiff's] feelings – his honor – his pride – his social position," and explaining that in such cases, the jury "should render large damages, *not as punishment*, but to compensate the actual injury") (emphasis supplied).

It is true that the structure of the damages awards in pre-1776 English cases appears to be somewhat different than it is today. The damages verdicts discussed in those cases were comprised of one large sum, meaning that any punishment damages that were awarded were not clearly separated out from compensatory damages that were also awarded, as they would be today. See, e.g., *Wilkes*, 98 Eng. Rep. at 499 (noting that the jury awarded the plaintiff £1,000); *Grey*, 95 Eng. Rep. at 794 (noting that the jury awarded the plaintiff £200). This makes it difficult, in retrospect, to identify which portions of those verdicts, if any, were serving a purpose of punishment. And it does appear that there may have been some elements of non-economic compensatory damages included in the high awards some English juries gave: for example, the court in

*Benson* noted the "scandal[] and disgrace[]" experienced by the plaintiff when considering whether the jury's verdict was excessive. 97 Eng. Rep. at 1130.

However, we reject Devereux's argument that punishment damages did not exist at all in pre-1776 England, and that the high damages English juries awarded were exclusively compensatory in nature. To the contrary, the six English cases discussed above show that some of the damages English juries awarded served "as a punishment to the guilty, to deter from any such proceeding for the future." *Wilkes*, 98 Eng. Rep. at 498. See also *Tullidge*, 95 Eng. Rep. at 909 (noting that high damages and possibly another lawsuit were appropriate because the defendant "ought to be punished twice"). Moreover, other cases reference "exemplary damages" and damages "for example's sake," indicating that the damages the juries awarded did not serve a compensatory purpose; they were awarded to make an example out of the bad actor, expressing society's outrage against this action and deterring future abuses. See, e.g., *Huckle*, 95 Eng. Rep. at 769 (holding that the jury had "done right in giving

exemplary damages"); *Tullidge*, 95 Eng. rep. at 909 (noting that "[a]ctions of this sort are brought for example's sake"); *Grey*, 95 Eng. Rep. at 795 ("[T]he jury have done right in giving exemplary damages[.]"). Thus, we conclude that punishment damages of some kind existed in England in 1776, and the mere fact that jury awards may have been partially compensatory—for economic and non-economic damages—does not erase the fact that the juries were authorized to award some damages designed to punish the defendant. Taylor has therefore shown that punishment damages existed in England in 1776.

> (c) *In 1776 England, damages were not awarded to punish defendants who acted only with an "entire want of care."*

Continuing our analysis of whether the punitive damages Taylor seeks were included within the scope of the jury trial right in 1798 Georgia, we consider whether the cases Taylor cites show that her claim that Devereux acted with an "entire want of care" was the kind of claim that could have supported punishment damages in 1776 England. Devereux contends that even if damages were

61

awarded to punish defendants, they were awarded only in cases where the defendant engaged in "intentionally abusive conduct" or had a "specific intent to inflict harm."  Here, by contrast, Taylor's claim for punitive damages stemmed from an allegation that Devereux acted with an "entire want of care."  See OCGA § 51-12-5.1 (b) (providing for punitive damages when a defendant's actions show "that entire want of care which would raise the presumption of conscious indifference to consequences").[33]  And because Taylor's claim of premises liability required only that she prove that Devereux "fail[ed] to exercise ordinary care in keeping the premises and approaches safe," OCGA § 51-3-1, she did not need to prove any intentional misconduct to prevail on her underlying claim of premises liability under OCGA § 51-3-1 or as part of her claim for punitive damages under OCGA § 51-12-5.1 (b).[34]

---

[33] As noted above, Taylor did not contend that her claim for punitive damages was based on Devereux acting with "the specific intent to cause harm" under OCGA § 51-12-5.1 (f).

[34] Likewise, Taylor was not required to show that Devereux engaged in intentional misconduct with respect to the other claims she alleged (which are recounted above in Division I).

We acknowledge that nothing contained in the English cases discussed above expressly limited punishment damages to claims of intentional misconduct. However, Taylor has the burden of showing a "clear and palpable" conflict between OCGA § 51-12-5.1 (g) and Georgia's constitutional right to trial by jury. *Barnhill*, 315 Ga. at 311. And unlike the claim at issue in this case, each of the cases Taylor has cited to show the use of punishment damages before 1798 involved a claim of intentional misconduct. Indeed, the claims in those cases were for "[t]respass, assault, and imprisonment," *Huckle*, 95 Eng. Rep. at 768; "trespass, for entering the plaintiff's house, breaking his locks, and seizing his papers," *Wilkes*, 98 Eng. Rep. at 489; "trespass and false imprisonment," *Beardmore*, 95 Eng. Rep. at 790; "assault and battery," *Grey*, 95 Eng. Rep. at 794; "order[ing] [an] innocent man to be flogged," *Benson*, 97 Eng. Rep. at 1130; and "[t]respass" and "assault," *Tullidge*, 95 Eng. Rep. at 909. See also Blackstone at 208 (explaining that an action for trespass generally includes "any misfeasance, or act of one man whereby another is injuriously treated or damnified"); id. at 209

63

(explaining that trespass in the more "limited" sense means "an entry on another man's ground without a lawful authority, and doing some damages, however inconsiderable, to his real property"); id. at 120 (explaining that assault "is an attempt or offer to beat another," such as if "one lifts up his cane, or his fist, in a threat[e]ning manner at another; or strikes at him, but misses him"); id. at 127 (explaining that false imprisonment requires "1. The detention of the person; and, 2. The unlawfulness of such detention," including "confinement or detention without sufficient authority"); id. at 120 (explaining that battery "is the unlawful beating of another," including "[t]he least touching of another's person wilfully, or in anger").[35]   Additionally, an examination of

---

[35] At this time (before and during 1776), claims for injuries were divided into actions of "trespass *vi et armis*" (or simply "trespass") and actions for "trespass on the case" (also known as "actions on the case").  Blackstone at 209. "[W]henever the act itself is directly and immediately injurious to the person or property of another, and therefore necessarily accompanied with some force, and action of trespass *vi et armis* will lie; but, if the injury is only consequential, a special action of trespass *on the case* may be brought."  Id.  See also Blackstone at 122 (explaining that the "action, of trespass, or transgression, on the case, is an [sic] universal remedy, given for all personal wrongs and injuries without force . . . .  And it is a settled distinction, that where an act is done which is in itself an *immediate* injury to another's person

64

some of the language used to describe the wrongs for which punishment damages were awarded in those cases shows that the defendants' intentional misconduct was in fact a key aspect of the claims for which punishment damages were awarded.

For example, in *Huckle*, the Chief Justice of the King's Bench described the defendant's actions of executing an illegal warrant as

or property, there the remedy is usually by an action of trespass *vi et armis*; but where there is no act done, but only a culpable omission; or where the act is not immediately injuries, but only by *consequence* and collaterally; there no action of trespass *vi et armis* will lie, but an action on the special case, for the damages consequent on such omission or act"). The claims in the six cases described above—such as for assault, battery, and false imprisonment—were brought as actions for trespass *vi et armis*. See Blackstone at 120-121 (assault and battery), 138 (false imprisonment).

Actions on the case, on the other hand, "may be regarded as the ancestor of the modern tort action based on negligence." Sonja Larsen, 1 Am. Jur. 2d Actions, § 18 Trespass on the case; as distinguished from trespass (Feb. 2023 update). "Some authority makes the distinction" between trepass *vi et armis* and trespass on the case "on the basis of the defendant's intent, stating that trespass involves a willful and deliberate act while trespass on the case contemplates an act or omission resulting from negligence." Id. However, some actions on the case could still involve claims of defendants engaging in intentional misconduct. Notably, actions for nuisance, discussed above in footnote 31 and again in footnote 37 below, were generally brought as actions on the case at English common law. See Blackstone at 220. However, as explained in footnote 37, the nature of the acts alleged to support a repeated nuisance claim—which includes continuing the actions that create a nuisance after notice of the initial claim—could support an award of "exemplary damages" because the defendant in such a case would have engaged in intentional misconduct.

65

"exercising arbitrary power, violating Magna Charta, and attempting to destroy the liberty of the kingdom." 95 Eng. Rep. at 769. In *Wilkes*, the Chief Justice discussed the Secretary of State's "claim[ing] a right . . . to force persons houses, break open escrutores, seize their paper, [etc.]," 98 Eng. Rep. at 498. Similarly in *Beardmore*, the court described the defendant's actions as "an unlawful power assumed by a great minister of State." 95 Eng. Rep. at 794. In this way, it is clear that the claims in these cases—which the court agreed with—were not that the defendants negligently or carelessly searched the plaintiff's houses but rather that these defendants knowingly "exercis[ed] arbitrary power," "claimed a right," or "assumed" "an unlawful power," *Huckle*, 95 Eng. Rep. at 769; *Wilkes*, 98 Eng. Rep. at 498; *Beardmore*, 95 Eng. Rep. at 794— not that the defendants acted merely with an "entire want of care."[36]

---

[36] As the dissenting opinion points out, the defendants in *Huckle*, *Wilkes*, and *Beardmore* were the people who executed the illegal warrants, rather than the government official who issued them. But we do not see how this fact affects the conclusion that those cases involved claims of intentional misconduct. The dissenting opinion asserts that the defendants in these cases "understood" the warrants "to be legally sanctioned" and that "[f]rom the

defendants' points of view . . . they had legal authority and justification to enter the plaintiffs' homes" and engage in the associated conduct, Dissent Op. 13, 15-16. As an initial matter, none of the cases actually say or even indicate that was so. But in any event, the juries in those cases found the defendants liable for claims of intentional misconduct—trespass (in all three cases) and assault and false imprisonment (in some of the cases)—and the courts in fact attributed intentional misconduct to the defendants.

The court in *Huckle*, for example, described "enter[ing] a man's house by virtue of a nameless warrant" as "worse than the Spanish Inquisition," 95 Eng. Rep. at 769, and indicated that the warrant, which plainly did not name any specific person, was directed to the messengers:

> [A] warrant was granted by Lord Halifax, Secretary of State, *directed to four messengers*, to apprehend and seize the printers and publishers of a paper called the North Briton, Number 45, without any information or charge laid before the Secretary of State, previous to the granting thereof, and *without naming any person whatsoever in the warrant*; Carrington, the first of the messengers to whom the warrant was directed, from some private intelligence he had got that Leech was the printer of the North Briton, Number 45, directed the defendant to execute the warrant upon the plaintiff, (one of Leech's journeymen,) and took him into custody for about six hours.

95 Eng. Rep. at 768 (emphasis supplied).

Similarly, in *Wilkes*, the judge noted that evidence was presented from which the jury could infer that the defendant Wood was "very active in the affair" and explained to the jury that if it found that Wood was an "[a]ider[] and abetter[]," rather than "a person present remains only a spectator," it "must find a verdict for the plaintiff with damages"—which it did. *Wilkes,* 98 Eng. Rep. at 498. And in his explanation of the punishable conduct, the judge discussed both "the defendants" and Lord Halifax:

> The *defendants* claimed a right, under precedents, to force persons houses, break open escrutores, seize their papers, [etc.] upon a general warrant, where no inventory is made of the things thus taken away, and where no offenders names are specified in the warrant, and therefore a discretionary power given to messengers to search wherever their suspicions may chance to fall. If such a power is truly invested in a Secretary of State, and he can *delegate this power*, it certainly may affect the person and property of every man in this kingdom, and is totally subversive of the liberty of the

67

Similarly, in *Grey*, the court noted that the defendant's acts were all acts of intentional misconduct: "the plaintiff has been used unlike a gentleman by the defendant in striking him, withholding his property, and insisting upon his privilege," 95 Eng. Rep. at 795. And in explaining why the damages were not excessive in *Benson*, the court noted that the defendant "had manifestly acted arbitrarily, unjustifiably, and unreasonably" in ordering an "innocent man to be flogged (though unjustly and improperly,) merely out of spite to his

subject.
Id. (emphasis supplied).

Finally, although the dissenting opinion asserts that the court in *Beardmore* "acknowledged the argument that Lord Halifax was 'more culpable'" than the defendants, Dissent Op. 14-15, the full context of that quote shows that the court was not persuaded by that argument:

> [T]he plaintiff has still another action against Lord Halifax, who, *it is said*, is more culpable than the defendants, who are only servants, and have done what he commanded them to do, and therefore the damages are excessive as to them: but we think *this is no topic of mitigation*, and for any thing we know the jury might say, "We will make no difference between the minister who executed, and the magistrate who granted this illegal warrant;" so the Court *must consider these damages as given against Lord Halifax*.

*Beardmore*, 95 Eng. Rep. at 793 (emphasis supplied). Contra Dissent Op. 15 n.11. In sum, in all three of these illegal warrant cases, punishment damages were given for claims of intentional misconduct that was attributed not only to the person who ordered the intentional misconduct, but also to the defendants who carried it out.

major" and the defendant "acted *malo animo*, and out of mere spite and revenge."  97 Eng. Rep. at 1130.  And in *Tullidge*, the evidence showed that the defendant "made his addresses to [the plaintiff's daughter] as a lover, with an intention (as she then thought) to marry her," and that the defendant "promised her marriage, and got her with child." 95 Eng. Rep. at 909.  In other words, the defendant engaged in intentional misconduct, lying to the plaintiff and his daughter about his intentions and taking advantage of them.[37]  The defendant's intentional misconduct in these cases was, in this way, a crucial part of the plaintiff's overall claim for damages, including for punishment damages.[38]

---

[37] The descriptions of exemplary damages in Blackstone supports that such damages were given only in cases of intentional misconduct, including for "adultery" and repeated nuisance.  Although an initial nuisance arguably could be caused by mere negligence and a nuisance claim was considered to be an "action on the case," "exemplary" damages were available for a nuisance claim only when the nuisance was *repeated*, meaning "the defendant has the hardiness to continue," Blackstone at 220, thus demonstrating intentionality insofar as the defendant continued the nuisance, even after being notified (by a first lawsuit) that the act was harming the plaintiff.

[38]  In addition to intentional misconduct, other aggravating circumstances were often listed by the courts in explaining why juries were authorized to award punishment damages.  For example, in cases of trespass

Taylor, however, contends that another case from pre-1776 England shows that punishment damages were awarded in cases where intentional misconduct was *not* a required element: *Farmer v. Darling*, 98 Eng. Rep. 27 (1766). Extrapolating from this case, Taylor argues that in 1798 Georgia, intentional misconduct was not required to authorize punishment damages. We disagree.[39]

based on an illegal warrant, the court emphasized the outrage to conceptions of liberty. See, e.g., *Huckle*, 95 Eng. Rep. at 769 (describing the defendant's act of "enter[ing] a man's house by virtue of a nameless warrant" as "worse than the Spanish Inquisition"); *Wilkes*, 98 Eng. Rep. at 498 (telling the jury that the Secretary of State's actions "certainly may affect the person and property of every man in this kingdom, and is totally subversive of the liberty of the subject"). And in *Tullidge*, the court noted that the defendant's insult to the plaintiff was particularly galling where "the plaintiff ha[d] received this insult in his own house; where he had civilly received the defendant, and permitted him to make his address to his daughter." 95 Eng. Rep. at 909.

[39] Citing *Day v. Woodworth*, 54 U.S. 363 (14 LE 181) (1851), Taylor also argues that punishment damages could be awarded in *all* torts: "It is a well-established principle of the common law, that in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive, or vindictive damages upon a defendant, having in view the enormity of his offence rather than the measure of compensation to the plaintiff." Id. at 371. *Day*, however, addressed a lawsuit between "a citizen of New York" and "citizens of Massachusetts" for an alleged trespass in Massachusetts, and was decided in 1851. Id. at 363. And although *Day* broadly referred to the "common law," it did not cite any cases in support of this statement or even clarify to which sources it was looking to determine the scope of "common law." Thus, we do not view this broad statement in *Day* in 1851 to be compelling evidence of the kinds of claims in which punishment damages could be awarded in England in 1776 or in Georgia in 1798.

In *Farmer*, the plaintiff had spent £140 defending himself against two claims brought by the defendant, which the plaintiff alleged were malicious prosecutions. See 98 Eng. Rep. at 28-29. The jury awarded the plaintiff £250 in damages, and on review, the court concluded that the damages were not excessive. See id. at 27-29. Under applicable precedent, malicious prosecution could be proven by "express or implied" malice, and the judge reported that "[i]t appeared upon the report 'that there was malice implied.'" 98 Eng. Rep at 27. Taylor argues that the high damages in that case were awarded to punish the defendant based only on *implied* malice and, citing a case from this Court that was decided more than 200 years after *Farmer*—*Parker v. State*, 270 Ga. 256 (507 SE2d 744) (1998), overruled in part on other grounds by *Linson v. State*, 287 Ga. 881, 886 (700 SE2d 394) (2010)—contends that implied malice is equivalent to "reckless disregard," and that intentional misconduct was not required to authorize punishment damages as a result. See *Parker*, 270 Ga. at 260 ("[R]eckless disregard for human life may be the equivalent of a specific intent to kill.").

We disagree with Taylor's characterization of *Farmer* and with her assessment of its significance. First, it is not clear that the high damages awarded in *Farmer* actually were punishment damages. There was no discussion in the opinion of punishment or making an example of the defendant; the judge told the jury that it could award the expenses paid by the plaintiff, or less, or "more, if they should see it proper to do so," and the plaintiff argued that the jury should consider "[t]he distress and vexation, and all the inconvenience the plaintiff was put to . . . as well as the pecuniary expense"—that is, ordinary economic and non-economic damages. 98 Eng. Rep. at 27-28. Second, *Parker* was a criminal case addressing the statutory elements of malice murder and whether a "reckless disregard for human life" could meet those requirements. See 270 Ga. at 259-260. *Parker*'s holding, even assuming it is correct, cannot be mapped onto the civil issue in *Farmer* 200 years in the past to require the conclusion that a defendant can be found guilty of malicious prosecution based on a jury finding that the defendant maliciously prosecuted the plaintiff but did not engage in intentional

misconduct.

Finally, although claims of malicious prosecution were generally brought as actions on the case (see footnote 35 for more discussion of "actions on the case"), they involved a claim that the defendant engaged in intentional misconduct. See Blackstone at 126 (explaining that a "way of destroying or injuring a man's reputation is, by preferring malicious indictments against him; which, under the mask of justice and public spirit, are sometimes made the engines of private spite and enmity," and the "usual way" for bringing a claim for this injury is "by a special action on the case"). For these reasons, *Farmer* does not show punishment damages being given against a defendant based on something other than intentional misconduct.[40]

---

[40] Taylor also cites *Bruce v. Rawlins*, 95 Eng. Rep. 934 (1770), and three cases dealing with claims of slander—*Townsend v. Hughes*, 86 Eng. Rep. 850 (1676), *Duke of York v. Pilkington*, 89 Eng. Rep. 918 (1682), and *Roe v. Hawkes*, 83 Eng. Rep. 316 (1663)—to show that English juries in 1776 could award punishment damages for claims like the one Taylor raises. In *Bruce*, the jury awarded £100 after the defendants trespassed in the plaintiff's house to search for "uncustomed goods." 95 Eng. Rep. at 934. Although the defendants "did very little or no damages," the "plaintiff's wife and daughter being only at home, were frightened and much surprised." Id. The court held that £100 was

By pointing only to pre-1776 English cases in which

---

not excessive.  Id. at 934-935.  The Chief Justice explained that "[t]he suspicion of having run-goods in his house is a very injurious imputation upon him; and though he is but a butcher, it is the same damage to him as if he was the greatest merchant in London," and further opined that the defendants "invaded the plaintiff's house and property, and disturbed his family."  Id.  Like in *Farmer*, it is not clear that any of the £100 of damages were awarded to punish the defendant, rather than to compensate him for intangible harms. However, even assuming these damages are indeed punishment damages, the plaintiff in this case was required to prove that the defendant engaged in intentional misconduct.

In *Townsend, Pilkington,* and *Roe*, juries awarded large damages for claims of slander.  See *Townsend*, 86 Eng. Rep. at 850 (jury awarded £4,000); *Pilkington*, 89 Eng. Rep. at 918 (jury awarded £100,000); *Roe*, 83 Eng. Rep. at 316 (jury awarded £700).  And in *Townsend* and *Roe*, the defendants requested new trials based on excessive damages, which the court denied.  See 86 Eng. Rep. at 850; 83 Eng. Rep. at 316.  However, Taylor points to nothing aside from the large damages award to support her argument that the damages in these cases were punishment damages, rather than, for example, damages for reputational harms.  And even assuming the damages were punishment damages, these cases do not show that punishment damages could be awarded for claims that the defendant did not act with intentional misconduct.  Even though slander claims were generally brought as actions on the case, see Blackstone at 123-124, such claims required showing that the defendant engaged in intentional misconduct, and in each of the three cases noted above, the defendants were alleged to have intentionally said unflattering things about the plaintiffs.  See Blackstone at 125 (explaining that "[w]ords of heat and passion, . . . if productive and of no ill consequence" and "words spoken in a friendly manner, as by way of advice, admonition, or concern, without any tincture or circumstance of ill will" are "not actionable" because "they are not *maliciously* spoken, which is part of the definition of slander") (emphasis in original).  See also id. at 123 (explaining that a claim for "Scandalis Magnatum"—the claim brought in *Townsend* and *Pilkington*—required showing that the defendant spoke words "in derogation of a peer, a judge, or other great officer of the realm" and that the claim for injuring a man's reputation involves "a man, maliciously and falsely, utter[ing] any slander or false tale of another").

74

punishment damages were awarded for claims that a defendant

engaged in intentional misconduct, Taylor has failed to show that

punishment damages could be awarded for her claim that Devereux

acted with an "entire want of care."  She has therefore failed to show

that the kind of punitive damages she seeks were within the scope

of the jury-trial right in Georgia in 1798.

> (d) *Early cases from other states do not show that punishment damages could be awarded for claims that did not involve the defendant's intentional misconduct.*

In addition to English cases, Taylor cites cases from other

states to argue that punitive damages were not limited to claims of

intentional misconduct.  We first note that although all of these

cases were decided before 1798, we do not afford them significant

persuasive value as evidence of the law in Georgia in 1798 because

they are not Georgia cases.[41]  And even assuming for the sake of

---

[41] Notably, these non-Georgia cases do not rely on any pre-1776 English cases.  And although it is possible that they are interpreting the same English common law in effect in Georgia at that time, the non-Georgia cases do not expressly indicate that is so, and in any event, Georgia's interpretation of the English common law controls.  See *Slaton v. Hall*, 168 Ga. 710, 716-717 (148

argument that these cases shed some light on Georgia's law in 1798, it is important to recognize that each of these cases involve a defendant who was punished (through high punishment damages) for intentional misconduct.

Taylor first argues that *Genay v. Norris*, a 1784 case from South Carolina, shows that juries could award punishment damages in cases where there was no claim that the defendant engaged in intentional misconduct. See 1 Bay 6, 6 (SC 1784). In *Genay*, the defendant, a physician, put "a large portion of cantharides" in the plaintiff's drink and caused him "extreme and excruciating pain." Id. The defendant argued that "the whole transaction was nothing more than what is usually termed a drunken frolic, and no injury was seriously intended" and that he "mistook the quantity poured into the glass; that he did not put so much as he thought, would by

---

SE 741) (1929) (explaining that "[t]he common law is presumed to be the same in all the American States where it prevails. Though courts in the different States may place a different construction upon a principle of common law, that does not change the law"); *Krogg v. Atlanta & W. P. R.R.*, 77 Ga. 202, 214 (1886) ("[W]e are not bound by the interpretation of the common law, as made by the courts of Alabama.").

any means, injure [the plaintiff]." Id. at 6-7. But the trial court appears to have rejected that argument, which is evident from its charge to the jury that "this was a very wanton outrage upon a stranger in the country" and that "notwithstanding it was called a frolic, yet the proceedings appeared to be the result of a combination, which wrought a very serious injury to the plaintiff, and such a one as entitled him to very exemplary damages, especially from a professional character, who *could not plead ignorance of the operation, and powerful effects of this medicine.*" Id. at 7 (emphasis supplied). In this way, the jury was told that the defendant knew what he was doing when he caused the injury: he engaged in intentional misconduct.[42]

The other pre-1798 non-Georgia cases Taylor cites fare no better. Although they indicate that juries in these states could

---

[42] This case was brought as an "action on the case." However, we note once again that the designation of this form of action does not itself control our analysis, and the instructions to the jury in this case show that the plaintiff acted with more than mere negligence or even recklessness—he instead engaged in intentional misconduct.

award punishment damages, they do not show that such damages could be awarded absent a claim grounded in intentional misconduct. See *Coryell v. Colbaugh*, 1 N.J.L. 77, 77 (1791) (in an "action of breach of promise of marriage," charging the jury "not to estimate the damages by any particular proof of suffering or actual loss; but to give damages for *example's* sake, to prevent such offences in future"). See also *Hoomes v. Kuhn*, 4 Call 274, 278 (Va. 1792); *Legaux v. Feasor*, 1 Yeates 586, 588 (Pa. 1795).[43]

Finally, Taylor points out that later discussions of punitive damages in an influential American treatise concluded that a "reckless disregard" of the rights of others was sufficient to support an award of punitive damages, thus supporting the notion that intentional misconduct was not required for a jury to award punishment damages in Georgia in 1798. See Theodore Sedgwick,

---

[43] We note that, like *Genay*, *Legaux* was brought as an "action on the case," and the court explained that this form of action was proper as long as the defendant did not use "unequivocal direct *force*." 1 Yeates at 588. That the claim in *Legaux* was brought as an action on the case does not preclude our determination that the claim involved the defendant engaging in intentional misconduct.

2 A Treatise on the Measure of Damages 720 (9th Ed. 1912) ("If the injury is wantonly inflicted, exemplary damages may be recovered; as for instance where the act was done with *reckless disregard of the rights of others*, or of the consequences of the act.") (emphasis supplied; footnote omitted). However, all of the cases cited by Sedgwick in support of this assertion were decided after 1830 and none were decided in Georgia, thus diminishing their value for answering the relevant question here.[44]

We do not dispute that at some point after 1798, punitive damages were in some courts around the United States authorized—in at least some instances—for conduct amounting to something less than intentional misconduct, such as for wanton or

---

[44] We note that recklessness and similar states of mind have at times long after 1798 been equated with an intentional misconduct under certain circumstances. See, e.g., George W. Field, *A Treatise on the Law of Damages*, 82-83 (2d ed. 1881) (explaining that in considering exemplary damages, "[t]he wrong must be intended, and the result of a spirit of mischief, wantonness, or of *criminal indifference to civil obligations, or the rights of others*, from which *malice may well be inferred*" (emphasis supplied)); *Milwaukee & St. P.R. Co. v. Arms*, 91 U.S. 489, 493-494 (23 LE 374) (1875) (explaining that the jury could not award punitive damages "unless [the wrongful act] was done wilfully, or was the result of that *reckless indifference to the rights of others which is equivalent to an intentional violation of them*." (emphasis supplied)).

reckless disregard of the rights of others. See, e.g., *Milwaukee & St. P.R. Co. v. Arms*, 91 U.S. 489, 493-494 (23 LE 374) (1875) (recognizing the power of the jury "to assess against the tort-feasor punitive or exemplary damages" in circumstances where "the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity," and explaining that "the malice spoken of in this rule is not merely the doing of an unlawful or injurious act: the word implies that the wrong complained of was conceived in the spirit of mischief, or *criminal indifference to civil obligations*") (emphasis supplied); *Kountz v. Brown*, 16 B.Mon. 577, 586 (55 Ky. 577) (1855) ("It is not alone for willful trespasses that exemplary damages are authorized by law to be given, but they are authorized also for acts of wanton and reckless carelessness.").[45]

---

[45] There is some evidence that by 1860, the law in England had similarly expanded punishment damages beyond damages to punish only intentional misconduct. See *Emblen v. Myers*, 6 Hurlstone and Norman 54, 54 (1860) (concluding that "[i]n an action for wilful negligence, the jury may take into consideration the motives of the defendant, and if the negligence is accompanied with a contempt of the plaintiff's rights and convenience, the jury may give exemplary damages," with one judge explaining, "If in actions of trespass the plaintiff may recover damages beyond the amount of the actual injury, I see no reason why the same rule should not extend to wilful negligence").

Courts in other states, however, indicated that punitive damages were not available absent intentional misconduct. See *Cole v. Tucker*, 6 Tex. 266, 268 (1851) ("Compensatory damages are given where the injury is not tainted with fraud, malice, or willful wrong; but where either of these elements intervene . . . damages are given as well for compensation to the sufferer as for the punishment of the offender."); *Hoyt v. Gelston & Schenck*, 13 Johns. 141, 151-152 (NY 1816) (noting that the judge held that the plaintiff's admission "that the defendants had not been influenced by any malicious motives" in their conduct and "had not acted therein with any view or design of oppressing or injuring the plaintiff" "precluded the plaintiff from claiming any damages against the defendants by way of punishment or smart money").[46]

---

[46] On the other end of the spectrum, at least one Georgia judge rejected altogether the availability of punitive damages. See *Cherry v. McCall*, 23 Ga. 193, 200 (1857) (expressing "for [him]self" a "strong conviction" that "vindictive, or punitive, or exemplary, damages" are not "authorized by law") (Benning, J., delivering the opinion of the Court); *Macon & W.R. Co. v. Winn*, 26 Ga. 250, 265 (1858) ("The doctrine of 'punitive' damages, is one for which I cannot see any warrant in the law.") (Benning, J., dissenting). For the reasons addressed in our discussion of pre-1798 Georgia law above, this judge's broad assertions that punishment damages were not supported by Georgia law were

81

We do not view these much later developments, which varied from state to state and court to court and were not clearly based in pre-1776 English law, as persuasive evidence of what the law of Georgia was in 1798.

Accordingly, Taylor has only presented evidence from which we can conclude that a plaintiff could succeed on a claim for punishment damages in Georgia in 1798 against a defendant who engaged in intentional misconduct. And she has not presented evidence from which we can conclude that a jury would be authorized to award such damages when a defendant acted only with an "entire want of care." It follows that the constitutionally protected right to a jury trial in Georgia does not include the right to have a jury determine

---

wrong. And his apparent misunderstanding of the history of punishment damages does not influence our view of what the law of Georgia was in 1798. Notably, the availability of punitive damages was codified in statute in Georgia in the 1860 Code of Georgia. See Ga. Code Ann. 1860, Part 2, Title 8, Chapter V, § 2998 (effective Jan. 1, 1863) ("In every tort there may be aggravating circumstances, aggravation either in the act or the intention, and in that event the jury may give additional damages, either to deter the wrong doer from repeating the trespass, or as compensation for the wounded feelings of the plaintiff.").

punitive damages under the circumstances of this case.[47]

E. *Conclusion*

Taylor has failed to show that the right to a jury trial under the Georgia Constitution protects the jury's award of punitive damages in this case. Although the cases cited by Taylor indicate that the right to a jury trial extended to some aspects of her case, they do not prove that the scope of the right included a jury awarding the punitive damages she seeks. More specifically, Taylor has not

---

[47] The dissenting opinion asserts that because juries were authorized to award punishment damages under certain circumstances in pre-1776 England and "given the breadth of a jury's authority," Georgia's constitutional right to a jury trial simply *must* have included "the right to have a jury determine whether punitive damages are warranted" and such a right therefore "inheres in a common law cause of action for premises liability." Dissent Op. at 10-11. But this assertion rests on multi-layered extrapolations unsupported by legal citations or analysis that compel this conclusion.

Moreover, this conclusion—which is based more on speculation than legal authority—cannot meet Taylor's burden of showing a "clear and palpable" conflict between the application of the statutory punitive damages cap to her claim and Georgia's Constitution—a heavy burden that has long been the standard plaintiffs must meet to prevail on a claim that a statute is unconstitutional. See, e.g., *Craig*, 1 Ga. at 547 (1846) (explaining, in 1846, that a court is justified in declaring a statute unconstitutional only if "the opposition between the constitution and the law . . . [is] plain and palpable."); *Flint River*, 5 Ga. at 209 (explaining, in 1848: "It must be a very clear and palpable case, which would warrant the Judiciary to exercise this delicate duty of declaring a law unconstitutional[.]"); *Carey*, 9 Ga. at 258 (explaining, in 1851: "To set [statutes] aside, their repugnancy to the Constitution should be most manifest.").

shown that juries in Georgia in or before 1798 or in England in or before 1776 were authorized to award punishment damages for claims in which the defendant acted only with an "entire want of care," as opposed to engaging in intentional misconduct. She has therefore failed to meet the difficult burden of showing a "clear and palpable" conflict between the application of the legislatively enacted punitive-damages cap in OCGA § 51-12-5.1 (g) to her claim and the right to a jury trial as preserved in the Georgia Constitution. See *Barnhill*, 315 Ga. at 311. See also *Metro. Cas. Ins. Co. of N.Y. v. Huhn*, 165 Ga. 667, 672 (142 SE 121) (1928) ("The provision in our constitution in reference to trial by jury should never in any way be impinged upon, in cases to which such provision is applicable. But it is not applicable to this case.").[48] As a result, Taylor has failed to

---

[48] Practically speaking, this means that the punitive damages awarded in this case were purely statutory in nature—created by the General Assembly consistent with its power to authorize punitive damages more expansive than the punishment damages that were available before 1798—including by authorizing punitive damages for claims that did not exist in 1798 or for conduct (such as an "entire want of care") that could not have been the basis for punishment damages in 1798. When a remedy such as punitive damages is not of constitutional origin and is instead purely a creation of statute, the Georgia Constitution's jury-trial right does not prevent the General Assembly from modifying that remedy—including by restricting it.

prove that OCGA § 51-12-5.1 (g)—which the trial court applied to reduce Taylor's punitive damages award to $250,000—violated her right to a jury trial protected by Article I, Section I, Paragraph XI (a) of the Georgia Constitution.

IV. *Separation of Powers*

Taylor next argues that OCGA § 51-12-5.1 (g) is a violation of the Georgia Constitution's guarantee of the separation of powers. Specifically, Taylor contends that the General Assembly cannot define the limits of punitive damages as it has in OCGA § 51-12-5.1 (g) because putting a ceiling on punitive damages essentially constitutes a legislative remittitur, and remittitur is a function reserved exclusively for the judicial branch. For the reasons we explain below, we disagree.

The Georgia Constitution provides: "The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided." Ga. Const. of 1983 Art. I, Sec. II, Para. III. When it comes

85

to the General Assembly's authority in our three-branch system, "we have held that the Legislature generally has the authority to define, limit, and modify available legal remedies." *Nestlehutt*, 286 Ga. at 737. See also, e.g., *Mack Trucks, Inc. v. Conkle*, 263 Ga. 539, 543 (436 SE2d 635) (1993) ("We have previously held that the legislature may lawfully circumscribe punitive damages in this circumstance.").[49] We have even made clear that "the General Assembly properly can enact legislation that departs from the common law. And, in fulfilling that legislative function, the General Assembly has not invaded the province of the judiciary." *Dion v. Y.S.G. Enterprises, Inc.*, 296 Ga. 185, 189 (766 SE2d 48) (2014) (citations and punctuation omitted). Cf., *Jones v. State*, 290 Ga. 670, 676 (725 SE2d 236) (2012) (rejecting a challenge based on the separation of powers doctrine because "the legislature acted within constitutional bounds in establishing maximum and minimum punishment and eliminating judicial discretion in sentencing

---

[49] As explained in Division III above, the legislature's authority to circumscribe damages may be limited by other constitutional provisions.

certain serious violent offenders") (citation and punctuation omitted).

As the discussion above shows, creating punitive damages like those Taylor was awarded here—and defining the parameters of that remedy's availability—is a legislative power. Taylor argues, however, that in creating a cap on punitive damages, the legislature improperly infringed on the judicial power of determining whether and when to grant a new trial.

It is true that the judicial branch alone has the power to "grant new trials on legal grounds," Ga. Const. of 1983 Art. VI, Sec. I, Para. IV, and that "[j]udicial remittitur, the power to reduce a damages award deemed clearly excessive, is a corollary of the courts' constitutionally derived authority to grant new trials," *Nestlehutt*, 286 Ga. at 737. In contending that OCGA § 51-12-5.1 (g) violates the separation of powers, Taylor characterizes the punitive damages cap contained in OCGA § 51-12-5.1 (g) as an improper legislative remittitur—a contention that, if correct, very well could constitute a

87

legislative usurpation of judicial power.[50]  But we are not persuaded

that the limitation contained in OCGA § 51-12-5.1 (g) constitutes a

remittitur as Taylor argues.

Unlike judicial remittitur, which involves judges weighing

evidence and is authorized only where the "'jury's award of damages

is clearly so . . . excessive as to any party as to be inconsistent with

the preponderance of the evidence,'" damages caps "are

---

[50] Taylor points out that some cases from other states have opined that legislative caps on damages are a violation of those states' separation of powers doctrines because they infringe on the judicial power of remittitur.  See *Best v. Taylor Mach. Works*, 179 Ill. 2d 367, 413 (689 NE2d 1057) (1997) (explaining that a cap on non-economic damages "undercuts the power, and obligation, of the judiciary to reduce excessive verdicts," and thus "functions as a 'legislative remittitur'"); *Sofie v. Fibreboard Corp.*, 112 Wash. 2d 636, 654 (771 P2d 711, 721) (1989), amended, 780 P2d 260 (Wash. 1989) (explaining that a statutory cap on non-economic damages "may, indeed, violate the separation of powers" because the cap applies without judicial "case-by-case determinations" of the circumstances of the case).  As Devereux points out, however, other states have rejected this idea of an improper legislative remittitur and concluded that damage caps do not run afoul of the required separation of powers.  See *Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 SW3d 364, 378 (Mo. 2012) (holding that a cap on punitive damages "does not violate the separation of powers doctrine" and rejecting the argument that such a cap "restrain[ed] the judiciary's power to grant remittitur of judgments"); *Rhyne v. K-Mart Corp.*, 149 N.C. App. 672, 679 (562 SE2d 82, 89) (2002) (rejecting a separation of powers challenge to a cap on punitive damages and explaining, "remittitur and the punitive damages cap operate under differing circumstances"); *Gourley ex rel. Gourley v. Nebraska Methodist Health Sys., Inc.*, 265 Neb. 918, 955 (663 NW2d 43, 76) (collecting cases that have "specifically disagreed with the reasoning that a cap acts as a legislative remittitur" and finding those cases more persuasive).

automatically triggered when a damages award exceeds the threshold amount." *Nestlehutt*, 286 Ga. at 737-738 (citing OCGA § 51-12-12 (b)). These caps do not require judges to weigh the evidence or other circumstances of the individual cases. Instead, the caps apply to all damages awards that fall under the statutorily-prescribed parameters. Thus, we conclude that the very nature and operation of OCGA § 51-12-5.1 (g) is different from the nature of the judicial remittitur power and does not infringe on the judicial power as Taylor contends. Taylor's claim that § 51-12-5.1 (g) is a violation of the separation of powers required by the Georgia Constitution fails.

V. *Equal Protection*

Finally, Taylor argues that OCGA § 51-12-5.1 (g) violates the Georgia Constitution's guarantee of equal protection. The Georgia Constitution says: "Protection to person and property is the paramount duty of government and shall be impartial and complete. No person shall be denied the equal protection of the laws." Ga. Const. of 1983 Art. I, Sec. I, Para. II.

"In analyzing an equal protection challenge, the first step is deciding what level of scrutiny to apply to the statute. If neither a suspect class nor a fundamental right is implicated, the most lenient level of judicial review—rational basis—applies." *Harvey v. Merchan*, 311 Ga. 811, 825-826 (860 SE2d 561) (2021) (citations and punctuation omitted).[51] Here, it is undisputed that Taylor is not a member of a protected class, and the only fundamental right Taylor argues is implicated by the statutory limit on punitive damages is her right to a jury trial under the Georgia Constitution. As explained in Division III above, the limit on punitive damages does not violate her constitutional right to a jury trial, and she does not argue that any other fundamental right is implicated. Thus, we apply rational basis review to her claim. See *Mack Trucks*, 263 Ga.

---

[51] We note that in *Harvey*, as in many of our cases, we treated the equal protection afforded by the Georgia Constitution as coextensive with that provided by the federal Constitution—in large part because the parties did not ask us to do otherwise. See 311 Ga. at 825 n.13. Although in this case, Taylor raises an equal protection claim under only the Georgia Constitution, "neither party makes an argument that the equal protection clause under Georgia's Constitution should be construed differently than the parallel provision in the United States Constitution. Therefore, we decline to consider in this case whether the state provision should be considered any differently than the federal provision." Id.

at 541 (applying "the rational basis test, which the parties concede is applicable here," to an equal protection challenge to OCGA § 51-12-5.1 (e) (2), which requires that 75 percent of a punitive damages award in a product liability action be paid into the state treasury); *Teasley*, 243 Ga. at 563-564 (considering whether "a rational relationship" existed supporting the elimination of exemplary damages for accident victims who did not sustain "serious injury").[52]

---

[52] Taylor cites some cases from other states that have applied a more stringent test than rational basis in evaluating statutory caps on punitive damages. See *Trujillo v. City of Albuquerque*, 110 NM 621, 628 (798 P2d 571) (1990) (holding that intermediate scrutiny should be applied to an equal protection challenge to a cap on damages recovered from a city because "[a] tort victim's interest in full recovery of damages calls . . . for a form of scrutiny somewhere between the largely toothless invocation of minimum rationality and the nearly fatal invocation of strict scrutiny.") (citation and punctuation omitted); *Balboni v. Ranger Am. of the V.I., Inc.*, 70 VI 1048, 1096 (2019) (applying heightened rational basis review to review an equal protection challenge to a cap on non-economic damages in car accidents because "heightened rational basis review represents the appropriate standard for determining the validity of a Virgin Islands statute under the equal protection clause of the Virgin Islands Bill of Rights"). We are not persuaded by the reasoning in these cases and note that the majority of states have applied the rational basis test. See *Gourley*, 265 Neb. at 946 (collecting cases and noting that "[a] majority of jurisdictions apply a rational basis or other similar test and determine that a statutory cap on damages does not violate equal protection"). See also, e.g., *Pulliam v. Coastal Emergency Servs. of Richmond, Inc.*, 257 Va. 1, 21 (509 SE2d 307) (1999) ("[N]o fundamental right or suspect class is affected by application of the medical malpractice cap."); *Phillips v. Mirac, Inc.*, 251 Mich. App. 586, 596-597 (651 NW2d 437) (2002) (applying

Under the rational basis test, the party challenging the constitutionality of a statute "bear[s] the burden of establishing that they are treated differently than similarly situated individuals and that there is no rational basis for such different treatment." *Harvey,* 311 Ga. at 826 (citations and punctuation omitted). "And because statutes are presumed to be constitutional, the party challenging the law must negate every conceivable basis that might support it." Id. See also *State v. Nankervis,* 295 Ga. 406, 408 (761 SE2d 1) (2014) ("Under the rational basis test, a court will uphold the statute if, under any conceivable set of facts, the classifications drawn in the statute bear a rational relationship to a legitimate end of government not prohibited by the Constitution.") (citations and punctuation omitted).

Here, Taylor argues that because OCGA § 51-12-5.1 (g)

rational basis to review a cap on recoverable damages for certain motor vehicle accidents, explaining that the cap "does not create an inherently suspect classification, nor is the fundamental right to a jury trial implicated" and that the cap is one of the "classification schemes created by various tort reform legislation [that] are social or economic legislation," which the court had held was subject to the rational basis test).

established a fixed amount as the cap on punitive damages, it treats similarly situated tort plaintiffs differently based on the amount of punitive damages the jury awards, explaining that, for example, where a jury awards $250,000 in punitive damages, the victim recovers 100 percent of the jury's award, but in a case like this one, where a jury awards $50,000,000, the plaintiff recovers only 0.5 percent of the jury's award. But even assuming for the sake of argument that (1) the two plaintiffs in Taylor's hypothetical are similarly situated for purposes of an equal protection analysis and (2) recovering different percentages of a jury's award is a difference that is cognizable under the equal protection rubric, Taylor's contention still fails. That is because we can identify a "conceivable basis that might support" this different treatment. *Harvey,* 311 Ga. at 826. For example, the General Assembly could have concluded that choosing a flat-sum cap rather than a cap based on, for example, a percentage of the jury's award was an appropriate way to address the need to punish and deter defendants while limiting economic uncertainty. See *Mack Trucks*, 263 Ga. at 543 (explaining that "the

93

legislature has determined that, absent specific intent to harm, there are public policy reasons which dictate that a cap should be placed on punitive damages").

Taylor further argues that the limit of $250,000 is not rationally related to any purpose that could be served by a limit on punitive damages because $250,000 is an arbitrary amount. However, to the extent this argument varies from the argument addressed above and is simply a challenge to the General Assembly's choice of $250,000, Taylor does not explain how $250,000 (as opposed to some other amount) treats similarly situated plaintiffs differently. That is a threshold requirement of an equal protection argument, and the argument fails for the lack of it.[53]

Thus, Taylor has failed to demonstrate a violation of the Georgia Constitution's equal protection guarantee. And because Taylor has not met the heavy burden required to show that OCGA § 51-12-5.1 (g) violates the Georgia Constitution, we affirm the trial

---

[53] This threshold requirement is also missing from Taylor's argument that because the $250,000 cap is not adjusted to inflation, it is too low to serve its intended purpose now.

court's order reducing the punitive damages award to $250,000.

## S22X1061

VI. *Sufficiency of the Evidence Supporting the Jury's Punitive Damages Award*

In its cross-appeal, Devereux first argues that the trial court should have granted its motion for a directed verdict on Taylor's claim for punitive damages. As noted above, OCGA § 51-12-5.1 (b) says: "Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Indeed,

> [s]omething more than the mere commission of a tort is necessary for the imposition of punitive damages. Negligence alone, even gross negligence, is insufficient to support punitive damages. Punitive damages cannot be imposed without a finding of culpable conduct based upon either intentional and wilful acts, or acts that exhibit an entire want of care and indifference to consequences.

*MDC Blackshear*, 273 Ga. at 173. When reviewing a jury's verdict

that the plaintiff is entitled to punitive damages, an appellate court considers whether there is any evidence to support the jury's verdict under the "clear and convincing" standard. See *Poverty Destroyed Forever, LLC v. Visio Financial Services, Inc.*, 360 Ga. App. 691, 692 (859 SE2d 612) (2021).

Here, Devereux argues that the jury could not find that there was clear and convincing evidence that Devereux acted with "an entire want of care and indifference to consequences" because there was evidence from which the jury could conclude that Devereux took some measures to ensure McGee's safety. For example, Devereux points to evidence that it vetted Singleterry and had no reason to believe he posed a danger, that Devereux prohibits sexual contact between staff and residents and trains staff about setting boundaries and sexual risk reduction, and that the number of direct-care professionals assigned to McGee's cottage on the night of the assault satisfied Devereux's required ratios. However, in reviewing the jury's verdict on appeal, we consider whether there is *any evidence to support* the jury's verdict—not whether there was any

96

evidence from which the jury could have concluded that Devereux's actions showed care.

With respect to the applicable "any evidence" standard, we conclude that Taylor did, indeed, present evidence from which jurors could have inferred that Devereux acted with "an entire want of care and indifference to consequences" with respect to McGee. To that end, although evidence was presented that Devereux ran a background check on Singleterry—as it does on all employees before they begin employment—evidence was also presented that despite Devereux's hiring policies, there were still incidents of Devereux staff members in other states sexually assaulting residents, including three before 2012 and five after 2012, and one incident of a staff member "grooming" two patients in the Georgia facility in 2017.[54] The jury also could have credited evidence that Devereux knew that its training and supervision policies failed to prevent two

---

[54] Devereux argues that these other occurrences were not sufficiently similar to constitute evidence in support of punitive damages. Of course, if the jury found these other incidents too dissimilar, it was authorized to disregard them.

incidents of patients sexually assaulting other patients in 2013 at the Georgia facility as well as the three incidents of inappropriate sexual activity between McGee and other residents in 2012. A Devereux employee testified that the incidents happened because of "poor supervision" and acknowledged that the staff needed "further training." As to training, although Hartman testified that all direct-care professionals were trained in "sexual risk reduction," Mays and Hudson testified that they were not given any training as to how to address "sexually reactive" patients. Further, Mays testified that she was not even told about McGee's "sexual reactivity" when assigned to supervise McGee's cottage.

Although evidence was presented that a sufficient number of direct-care professionals were assigned to McGee's cottage based on Devereux's required supervision ratios, the jury could have nonetheless credited evidence that the required ratios were routinely disregarded by direct-care professionals who left shifts early, and by Devereux, which took no action to address that situation. And although evidence was presented that there was no

98

indication Singleterry was a danger to any residents, the jury could have credited testimony that Singleterry being assigned to a female cottage was "a mismatch for him" and that he was assigned to supervise McGee's cottage only because Devereux had "a limited staff on the shift." The jury was also entitled to credit Mays's testimony that if she had been fully informed about McGee's "sexual reactivity," she would not have left Singleterry alone to supervise McGee's cottage. Finally, the jury could have credited evidence that after the sexual assault, Devereux did not take appropriate steps to help McGee recover from her trauma and did not implement its own recommendations to improve Devereux's hiring and training procedures developed in response to the crime. Given all of this evidence, and especially in light of McGee's history of being sexually abused and acting out sexually and her recent sexual activity at Devereux in three separate incidents, the jury could have concluded that Taylor presented clear and convincing evidence that Devereux's conduct demonstrated an "entire want of care" with respect to the safety of McGee and its other patients.

Even to the extent evidence was presented that supported the reasonableness of Devereux's training, hiring, or employment policies, or conflicting evidence was presented—such as about employee training related to sexual risks for residents or the efficacy of Devereux's supervision ratios—there was also evidence presented from which the jury could conclude that Taylor presented clear and convincing evidence that Devereux's actions toward McGee demonstrated an "entire want of care which would raise the presumption of conscious indifference to consequences." See, e.g., *Ponce de Leon Condos. v. DiGirolamo*, 238 Ga. 188, 189-190 (232 SE2d 62) (1977) (holding that when the "appellants made some effort to alleviate" the run-off problem they created, but did not address the source of the problem, "[t]he jury was authorized to find that appellants had acted with 'conscious indifference' to consequences, if not in creating, then in failing to correct a drainage system which was causing damage to appellee"); *Jones v. Bebee*, 353 Ga. App. 689, 695 (839 SE2d 189) (2020) (holding that the trial court did not err by denying the motion for directed verdict on punitive

100

damages, because "while it is true that there was some evidence of remedial steps taken by the Joneses after the first two attacks by their dog, it was for the jury to determine 'whether the actions [the Joneses] took on the day of the incident showed the requisite want of care or conscious indifference to the consequences that would warrant punitive damages") (citation and punctuation omitted; alteration in original).[55]  Thus, Devereux has failed to show that

---

[55] Devereux cites several cases where the evidence was found to be insufficient to support an award of punitive damages, arguing that these cases show that as long as Devereux took *some* measures to protect McGee, it cannot be liable for punitive damages.  The cases decided by this Court are distinguishable from the case before us because in those cases the evidence showed that the defendants took reasonable steps to avoid the injury and there was no additional evidence showing a want of care.  See *MDC Blackshear*, 273 Ga. at 174 (holding that although the appellant may have been negligent in failing to correctly determine the owner of the land after the appellee informed it of his claim, in light of the appellant's due diligence, including performing a title search and the sanction the appellant received from City officials to pave the property, the trial court should not have concluded that "the record shows clearly and convincingly that [the appellant]'s actions were in wanton and willful disregard of [the appellee]'s property rights"); *Stone Man, Inc. v. Green*, 263 Ga. 470, 471-472 (435 SE2d 205) (1993) (holding that although the appellant's operation of a quarry was a nuisance, in this case of a commercial enterprise "which is accompanied by a certain amount of unpleasant but unavoidable effects or byproducts," the appellant's "compliance with county, state, and federal regulations is not the type of behavior which supports an award of punitive damages").  Devereux also cites a number of cases from the Court of Appeals.  Even assuming without deciding that all of these cases were correctly decided, they are not binding on this Court and are, in any event, factually distinguishable.  See, e.g., *Roberts v. Quick Rx Drugs, Inc.*, 343 Ga.

101

there was insufficient evidence to support the jury's verdict on punitive damages, and we affirm that verdict as a result.

VII. *Sufficiency of the Evidence Supporting the Attorney Fee Award*

Devereux next argues that the jury's verdict that Taylor was entitled to attorney fees was not supported by the evidence. OCGA § 13-6-11 says:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

The jury found that Devereux acted in bad faith.[56] "The issue of attorney fees under OCGA § 13-6-11 is a question for the jury and

---

App. 556, 561-562 (807 SE2d 476) (2017); *Wardlaw v. Ivey*, 297 Ga. App. 240, 242 (676 SE2d 858) (2009).

[56] As noted above in Division I, the jury marked on the verdict form both that Devereux had acted in bad faith and had been "stubbornly litigious or caused unnecessary trouble or expense." Because, as discussed below, we affirm the bad-faith basis for the attorney fee award, we need not decide whether there was any evidence to support this alternate basis for attorney fees. See, e.g., *Burlington Air Express, Inc. v. Georgia-Pacific Corp.,* 217 Ga. App. 312, 313-314 (457 SE2d 219) (1995).

an award will be upheld if there is any evidence to support it." *Duffy St. S.R.O., Inc. v. Mobley*, 266 Ga. 849, 850 (471 SE2d 507) (1996). See also *City of Hoschton v. Horizon Communities*, 287 Ga. 567, 569 (697 SE2d 824) (2010) ("An award of attorney fees under OCGA § 13-6-11 will be affirmed if there is any evidence to support it."). Bad faith warranting an award of attorney fees must be based on conduct "during the transaction out of which the lawsuit arose." *Merlino v. City of Atlanta*, 283 Ga. 186, 191 (657 SE2d 859) (2008).

Both parties argue that the bad-faith question here is tied to the question of punitive damages, with Devereux asserting that "the bad faith claim fails for the same reason as the punitive damages claim."[57] However, we have already held in Division VI that there was at least some evidence presented at trial from which the jury

---

[57] Although Devereux cites language from *Wilson v. Redmond Constr., Inc.*, 359 Ga. App. 814, 816-817 (860 SE2d 118) (2021), arguing that there was no evidence it acted with "sinister motive," "ill will," or "conscious doing of wrong," Devereux does not argue that in order to show bad faith, Taylor was required to prove something more than that Devereux acted with an "entire want of care." Rather, Devereux argues that Taylor failed to present evidence that Devereux acted with an "entire want of care"—an argument we reject in Division VI above.

could conclude that Devereux acted with "that entire want of care which would raise the presumption of conscious indifference to consequences" with respect to McGee's sexual assault, OCGA § 51-12-5.1 (b). See also *Tyler*, 272 Ga. at 120 ("A conscious indifference to consequences relates to an intentional disregard of the rights of another."). Just as this evidence supports the jury's finding that Taylor was entitled to punitive damages under OCGA § 51-12-5.1 (b), it constitutes "any evidence" to support the jury's finding that Devereux acted in bad faith toward McGee by being consciously indifferent to the consequences of its failure to, among other things, give McGee appropriate and adequate supervision. See, e.g., *Merlino*, 283 Ga. at 190-191 (concluding that the defendant's plugging a pipe despite knowing that such action could lead to flooding on the plaintiff's property was "some evidence" from which the jury could find "bad faith"); *DiGirolamo*, 238 Ga. at 190 ("The same testimony as to the appellee's early, persistent, and unheeded complaints which authorizes the verdict for punitive damages in this case also provides authorization for the jury's finding that the

104

appellants acted in bad faith in failing to correct the run-off problem."). Thus, we conclude that the evidence presented at trial was sufficient to support the jury's finding that Taylor was entitled to attorney fees under OCGA § 13-6-11.

VIII. *Sufficiency of the Evidence Supporting the Trial Court's Determination of the Amount of Attorney Fees*

Devereux next argues that Taylor did not present sufficient evidence of the amount of attorney fees to which Taylor was entitled. As noted above in Division I, after the jury found that Taylor was entitled to attorney fees, the parties agreed that the trial court should determine the amount of fees, and the trial court held a hearing on the fee amount and concluded that Taylor was entitled to 40 percent of the recoverable damages award, or $2,100,000 in attorney fees.[58] On appeal, Devereux argues (as it did at trial) that Taylor's attorney fee award could not be based on the 40 percent contingency fee agreement she signed with her attorneys—and which she entered into evidence at the hearing on attorney fees—

---

[58] This was calculated based on the jury's verdicts with the $250,000 limit on punitive damages applied, see OCGA § 51-12-5.1 (g).

and that Taylor otherwise failed to present evidence sufficient to prove the amount of her attorney fees.

In addressing this argument, both parties argue that we should look to the standard this Court set out in *Georgia Department of Corrections v. Couch*, 295 Ga. 469 (759 SE2d 804) (2014), in which we evaluated what kind of evidence was necessary to prove the amount of attorney fees under OCGA § 9-11-68 when the party seeking fees signed a contingency-fee agreement. More specifically, Taylor points out that the attorney fee award at issue in this case was made under OCGA § 13-6-11, and that the text of OCGA §§ 9-11-68 and 13-6-11 differs in the way it describes the attorney fees that can be awarded. Compare OCGA § 9-11-68 (providing for the recovery of "reasonable attorney's fees") with OCGA § 13-6-11 (providing for the recovery of "[t]he expenses of litigation"). She argues, however, that we "need not reach" whether we should apply a more favorable standard to her attorney fee award based on the lack of "reasonable" language in OCGA § 13-6-11, because she wins under the arguably stricter standard set out in *Couch*. We agree

106

that Taylor prevails even applying *Couch*. We therefore assume

without deciding that *Couch* applies to the attorney fee award at

issue in this case, and we conclude that Taylor has met the standard

set forth in *Couch*.

> In *Couch*, this Court said:

> "[E]vidence of the existence of a contingent fee contract,
> without more, is not sufficient to support the award of
> attorney fees. An attorney cannot recover for professional
> services without proof of the value of those services."

295 Ga. at 483 (citing *Brandenburg v. All–Fleet Refinishing, Inc.*,

252 Ga. App. 40, 43 (555 SE2d 508) (2001)). We further explained

that in determining the amount of an award of attorney fees, "'[a]

court may consider a contingent fee agreement,'" but

> "[w]hen a party seeks fees based on a contingent fee
> agreement, . . . the party must show that the contingency
> fee percentage was a usual or customary fee for such case
> and that the contingency fee was a valid indicator of the
> value of the professional services rendered. In addition,
> the party seeking fees must also introduce evidence of
> hours, rates, or some other indication of the value of the
> professional services actually rendered."

Id. (citing *Brock Built, LLC v. Blake*, 316 Ga. App. 710, 714-715 (730

SE2d 180) (2012)).

"It is solely for the trier of fact to resolve whether attorney fees and expenses should be awarded under OCGA § 13-6-11, and, if so, in what amount. . . . We review the decision about whether and to what extent to award attorney fees and expenses under the deferential 'any evidence' standard." *Water's Edge Plantation Homeowner's Ass'n, Inc. v. Reliford*, 315 Ga. App. 618, 619 (727 SE2d 234) (2012). See also *City of Hoschton*, 287 Ga. at 569.

A. *Evidence Submitted by Taylor Showing the Amount of her Attorney Fees*

As evidence of her attorney fees, Taylor presented the contract signed by McGee and then Taylor agreeing to pay her attorneys a 40 percent contingency fee for trial work as well as affidavits from five attorneys, employed by three law firms, who worked on the case. Three attorneys from the first law firm described their qualifications; averred that the 40 percent contingency fee was customary for this kind of case; and summarized the work that plaintiff's counsel did on the case over nearly eight years, including investigating McGee's sexual assault, meeting with potential

witnesses, attempting to settle the case without litigation, drafting and filing the complaint, taking nine depositions, defending depositions of two witnesses, inspecting Devereux's Georgia facilities, drafting discovery requests and responses, reviewing discovery, litigating discovery issues, briefing and arguing against Devereux's motions for summary judgment on punitive damages and litigation expenses, reviewing and briefing the admissibility of other incidents, attending a pretrial conference on motions in limine, preparing for trial, and participating in the trial. An attorney from the second law firm described his qualifications and summarized the work done by the plaintiffs' attorneys, pointing to the same acts described by the other three attorneys. And an attorney from the third law firm described her qualifications and the appropriateness of the contingency fee. Additionally, one attorney from each law firm detailed the expenses advanced by each firm.[59]

Devereux submitted an affidavit from one of its lawyers

---

[59] Devereux does not dispute the appropriateness of the amount awarded by the trial court in litigation expenses.

attesting that Devereux's attorneys and paralegals worked 730.4 hours on the case. Taylor responded with supplemental affidavits from four attorneys, who "reasonably estimate[d]," based on their "education, training, and experience, and based on the work [they] performed on this case, as well as the work performed by Plaintiff's other counsel" that Taylor's counsel "has worked, at least, four to five times as much as" Devereux's counsel on the case. The affidavits noted that for most of the case, only one attorney from the firm representing Devereux formally appeared and litigated the action, whereas Taylor "has reasonably and necessarily been represented by at least eight attorneys . . . throughout substantial phases of this action," and that "at trial itself, at least six attorneys, plus an assistant, paralegal, and a trial consultant (who herself is a lawyer), represented Plaintiff and divided up various tasks at trial." Further, one of Taylor's attorneys stated that his hourly rate is $625 per hour and that the reasonable market rates for the work of the three attorneys from the first law firm who submitted affidavits would be $625, $875, and $900 per hour, based on their experience

110

and the type of work they completed on this case. He then multiplied the lowest market rate of $625 per hour by 2921.6 and 3652 hours[60] to conclude that the reasonable attorney fee range was $1,826,000 to $2,282,500. Supplemental affidavits stated that Taylor's counsel had rendered more services since counsel had submitted their initial affidavits, including handling post-trial discovery requests from Devereux, preparing and responding to briefs about attorney fees and the punitive damages cap, preparing filings addressing McGee's death, and preparing for a hearing about attorney fees and punitive damages.

As it noted in its order on attorney fees, the trial court considered the affidavits submitted by Taylor's attorneys and found that the "40% contingency fee is usual and customary and is reasonable under the circumstances in this case." The trial court then considered whether the contingency amount "'was a valid indicator of the value of the professional services rendered,'" citing *Couch*, 295 Ga. at 483. The court observed that the case was "time-

---

[60] These hours were calculated by multiplying 730.4 hours by 4 and by 5.

111

consuming, complex, and hard-fought" and noted that the attorney affidavits "set forth information relating to the value of the professional services actually rendered" and noted that during the trial, "[a]pproximately 6 attorneys, 1 assistant, 1 paralegal, and 1 trial consultant (also an attorney), appeared at trial and divvyed up the various tasks a jury trial requires." The court also observed that counsel completed substantial legal work on behalf of Taylor post-trial. The court thus found that Taylor "provided sufficient evidence of the value of the professional services actually rendered by her trial counsel over an eight-year period" and that all of the circumstances "justify the 40% contingency fee of the jury's enforceable verdict," citing several Court of Appeals cases, including one applying *Couch*: *Cajun Contractors, Inc. v. Peachtree Property Sub, LLC*, 360 Ga. App. 390, 405-406 (861 SE2d 222) (2021).

B. *Sufficiency of the Evidence Supporting the Amount of Attorney Fees*

Devereux argues that the evidence described above was not sufficient under *Couch* to support the attorney fee award because

112

Taylor presented merely "broad summaries" of work performed and "hindsight estimates" of the time spent. And although it is true that Taylor did not present contemporaneous records documenting each hour her attorneys spent working on the case, that is not what *Couch* requires. We said in *Couch* that when a party seeks attorney fees based on a contingency-fee agreement, the party "must show that the contingency fee percentage was a usual or customary fee for such case and that the contingency fee was a valid indicator of the value of the professional services rendered," and that "the party seeking fees must also introduce evidence of hours, rates, *or some other indication of the value* of the professional services actually rendered." 295 Ga. at 483 (emphasis supplied).

Here, where Taylor presented not only her contingency-fee agreement but also evidence that the contingency fee was customary for this kind of case, and evidence of the amount and type of work done by the many attorneys who represented her, we cannot say that the trial court erred by concluding that the standard we articulated in *Couch* was met. See *Cajun Contractors*, 360 Ga. App. at 405-406

113

(holding that the party seeking attorney fees presented sufficient evidence of the amount of attorney fees where the party presented evidence of the contingency fee agreement, affidavits that the fee was customary and reasonable, estimates of the number of the hours the attorneys performed, and affidavits describing the work the attorneys performed). See also *City of Atlanta v. Hofrichter/Stiakakis*, 291 Ga. App. 883, 890 (663 SE2d 379) (2008) (holding that the evidence was sufficient to establish the amount of attorney fees when the plaintiff introduced the 40 percent contingency fee contract and evidence that this was the customary fee in such a case and that her attorney "had taken over 26 depositions and had spent hundreds of hours on the case").[61]

---

[61] In support of its argument, Devereux cites several cases in which there was no contingency fee agreement and the Court of Appeals held that only generalized summaries of the number of hours spent on the case was insufficient evidence to sustain the amount of the fee award. See, e.g., *Hardnett v. Ogundele*, 291 Ga. App. 241, 245 (661 SE2d 627) (2008). We do not view these cases as persuasive in the context of this case, where the contingency-fee agreement and evidence that it was a customary fee was presented to, and considered by, the fact-finder. Devereux also cites *Kennison v. Mayfield*, 359 Ga. App. 52 (856 SE2d 738) (2021), in which the Court of Appeals held that the evidence presented was not sufficient to support the trial court's award of attorney fees that matched the fees due under the contingency-

IX.  Nunc Pro Tunc *Entry of the Final Judgment Pertaining to Compensatory and Punitive Damages*

Finally, Devereux contends that the trial court erred when, as part of the "Final Judgment" entered on February 8, 2022, the trial court entered the judgments as to compensatory and punitive damages nunc pro tunc[62] to the entry of the jury's verdicts on November 18 and 19, 2019, and therefore ordered that those amounts begin accruing post-judgment interest from the dates of the verdicts, as opposed to from the date the "Final Judgment" was entered.  Devereux argues that this was improper because the

---

fee agreement.  See id. at 68.  We have real doubts about the correctness of *Kennison*'s holding on this issue under *Couch*, some of which were also raised by the dissent in that case.  See 359 Ga. App. at 73, 76-77 (McFadden, C.J., concurring fully in part and dissenting in part) (noting that the trial court "heard extensive evidence about the value of the professional services the plaintiffs' attorneys actually rendered, [and] made findings of fact on the issue").  Notably, the division of *Kennison* that pertains to the sufficiency of the evidence to show the attorney fee amount is not binding Court of Appeals precedent, because a majority of the judges did not fully concur in its rationale. See Court of Appeals Rule 33.2 (a) (1) ("If an appeal is decided by a division of this Court or by the Court sitting en banc, a published opinion in which a majority of the judges fully concur in the rationale and judgment of the decision is binding precedent.").

[62] The phrase "nunc pro tunc," which is Latin for "now for then," means that an order or judgment "ha[s] retroactive legal effect through a court's inherent power."  Black's Law Dictionary (11th ed. 2019).

attorney fee award had not yet been decided in November 2019, so the judgment was not final. However, Devereux has failed to show that the trial court erred by entering the damage judgments nunc pro tunc to the day they were rendered by the jury and imposing post-judgment interest from that date.

A trial court may enter a judgment nunc pro tunc to "perfect[] the record" and properly reflect when an order or judgment "should have been entered." *Maples v. Maples*, 289 Ga. 560, 562 (713 SE2d 865) (2011) ("The trial court had authority to enter a divorce decree nunc pro tunc as of [the prior] date . . . where the jury had previously returned a verdict and the cause was ripe for judgment.") (citations and punctuation omitted). This power applies to "all judgments, whether interlocutory or final." *Perdue v. Bradshaw*, 18 Ga. 287, 288 (1855) ("The Common Law rule is, that all judgments, whether interlocutory or final, shall be entered of record, of the day of the month and year when *signed*. Still, the discretion is given to the Court or Judge to order a judgment to be entered nunc pro tunc. Indeed, it is not only competent to do this, but it seems to be almost

116

a matter of course.") (emphasis in original). See also *Pendergrass v. Duke*, 147 Ga. 10, 11 (92 SE 649) (1917) ("A nunc pro tunc entry is for the purpose of recording some action that was taken or judgment rendered previously to the making of the entry, which is to take effect as of the former date.").

OCGA § 7-4-12 (a) provides that "[a]ll judgments in this state shall bear annual interest upon the principal amount recovered . . . ." And subsection (c) says: "The postjudgment interest provided for in this Code section shall apply automatically to all judgments in this state and the interest shall be collectable as a part of each judgment whether or not the judgment specifically reflects the entitlement to postjudgment interest." OCGA § 7-4-12 "presuppos[es] the rendition of a judgment for a sum certain, or for an amount mathematically determinable without reliance upon additional evidence." *Brown v. Brown*, 265 Ga. 725, 727 (462 SE2d 609) (1995).

In this case, Devereux is correct that the judgment in the case overall was not final in November 2019. See *Islamkhan v. Khan*,

117

299 Ga. 548, 550 (787 SE2d 731) (2016) (holding that because the trial court order reserved the pending issue of attorney fees for later determination, the order was not a "final judgment" but instead "an interlocutory order appealable only pursuant to the procedures set forth in OCGA § 5-6-34 (b)").[63] See also OCGA § 9-11-54 (b) ("[A]ny order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties[.]"). However, Devereux has not shown that a judgment of damages returned by a jury must be a "final judgment" that is immediately appealable in order for it to be a "judgment" under OCGA § 7-4-12. Here, we see no impediment to the trial court's entering the jury's damages awards—which fully decided the claims for compensatory and punitive damages—nunc pro tunc to

---

[63] OCGA § 5-6-34 (a) (1) says that "[a]ll final judgments, that is to say, where the case is no longer pending in the court below," may generally be immediately and directly appealed. OCGA § 5-6-34 (b) provides procedures to seek an appeal of "an order, decision, or judgment, not otherwise subject to direct appeal," including judgments that are not "final."

accurately reflect when the verdicts had been returned and signed by the jury. And we see no impediment to the court applying post-judgment interest to those judgments, which were "for a sum certain." *Brown*, 265 Ga. at 727.[64]

Notably, the Court of Appeals has affirmed a trial court's

---

[64] Although Devereux's main argument is that the judgments lacked finality because there was no decision on the attorney fee award, Devereux also notes in its brief on appeal that the punitive damages award also was not settled because the trial court had not decided whether OCGA § 51-12-5.1 (g) limited it. However, Devereux does not cite any authority for the proposition that a jury verdict cannot be subject to post-judgment interest if it is later reduced, and cases from this Court and the Court of Appeals indicate that post-judgment interest may still begin to run at the time the original judgment is entered, even if the judgment is later modified. See *CRS Sirrine v. Dravo Corp.*, 219 Ga. App. 301, 304 (464 SE2d 897) (1995) (adopting the federal approach to this question and holding: "In general, where a first judgment lacks an evidentiary or legal basis, post-judgment interest accrues from the date of the second judgment; where the original judgment is basically sound but is modified on remand, post-judgment interest accrues from the date of the first judgment."). See also *Sec. Life Ins. Co. of Am. v. St. Paul Fire & Marine Ins. Co.*, 278 Ga. 800, 803 (606 SE2d 855) (2004) (holding that the trial court was correct in computing post-judgment interest on the damages award from the date of entry of the original judgment because "the modified judgment is based on the same jury verdict and for the same damages as the judgment which was originally entered"); *Johansen v. Combustion Eng'g, Inc.*, 170 F3d 1320, 1339-1340 (11th Cir. 1999) ("Where the initial judgment is supported by the evidence and the later judgment merely reflects a remittitur of a certain portion of that judgment as excessive, the courts of appeals have routinely decided that damages were sufficiently 'ascertained' at the time of the first judgment and that post-judgment interest should run from the date of the original judgment.").

decision to make a judgment nunc pro tunc to the time of a jury's verdict in a case very similar to this one. In *Wingate Land & Development, LLC v. Robert C. Walker, Inc.*, 252 Ga. App. 818 (558 SE2d 13) (2001), the jury returned a verdict for the plaintiff as to his claims for compensation on April 2, 1999. Id. at 820, 823 n.9. The trial court then held a bench trial on the plaintiff's claim for attorney fees and decided that issue on March 15, 2000. Id. at 823. The court entered its final order deciding all issues in the case on March 15, but entered the portion of the judgment related to the jury's verdict nunc pro tunc "to give effect to the jury's verdict on the date the verdict was rendered." Id. The Court of Appeals affirmed the trial court's order. Id.

Devereux argues that we should not be guided by *Wingate* because the attorney-fee issue is not fully bifurcated here (as it was in *Wingate*), and the jury in this case decided the initial question of whether Devereux was liable for attorney fees. We are not persuaded that this distinction makes a difference here. In both cases, the damages had been fully and finally decided by the jury

120

even when the decision on the attorney fee amount remained outstanding. Like the Court of Appeals in *Wingate*, we conclude that the trial court was authorized to enter the jury verdicts nunc pro tunc and apply post-judgment interest to them in this situation.[65]

For these reasons, we conclude that the trial court did not err by applying post-judgment interest to the compensatory and punitive damage amounts under OCGA § 7-4-12, and we affirm that

---

[65] Devereux argues that instead of *Wingate*, we should follow *Schoenbaum Ltd. Co., LLC v. Lenox Pines, LLC*, 262 Ga. App. 457, 459 (585 SE2d 643) (2003), and *St. Paul Reinsurance Co. v. Ross*, 276 Ga. App. 135, 142 (622 SE2d 374) (2005), in which the Court of Appeals held that the trial court's application of post-judgment interest nunc pro tunc was improper. We disagree. *Schoenbaum* did not address completed jury verdicts but instead addressed the trial court's grant of partial summary judgment on one count in a 20-count complaint. 262 Ga. App. at 458-459. There, the Court of Appeals concluded that the trial court erred by ordering post-judgment interest to be paid on the amount awarded in the partial summary judgment, reasoning that "[p]ost-judgment interest accrues only after the entry of final judgment." Id. at 459-460. But in support of this assertion, the Court of Appeals cited only a case holding that the trial court erred by awarding post-judgment interest on the special master's award "prior to the jury verdict and entry of a final judgment," see *City of Atlanta v. Wright*, 159 Ga. App. 809, 809-810 (285 SE2d 250) (1981). And in *Ross*, the first order, which the Court of Appeals held the trial court should not apply post-judgment interest to, "did not spell out the dollar amount that was subject to garnishment." 276 Ga. App. at 137. We do not view either of these cases as supporting the notion that the trial court here could not enter nunc pro tunc and apply post-judgment interest to judgments for damages that had been fully decided by a jury for a specific sum.

121

order.[66]

*Judgments affirmed in Case Nos. S22A1060 and S22X1061.
All the Justices concur, except Colvin, J., who concurs specially as to
Division III, and Ellington, J., who dissents as to Division III and
concurs specially as to Division VIII. Peterson, P.J., disqualified.*

---

[66] To the extent Devereux argues that the imposition of post-judgment interest "violates basic principles of equity" because Devereux was not to blame for several of the delays between the jury's verdicts and the court's ruling on the attorney fees amount, we note that OCGA § 9-11-67 provides a way for a party to abate the accrual of interest. See also *JTH Tax, Inc. v. Flowers*, 311 Ga. App. 495, 495-496 (716 SE2d 559) (2011) (discussing the party's depositing into the court registry the amount awarded for one of the claims, thereby abating the accrual of interest on that amount). We also note that Devereux presented no evidence that it petitioned the trial court to resolve the attorney-fee issue earlier.

BETHEL, Justice, concurring.

In Division (III) (D) (ii) (d), the Court considers cases from sister states that were decided prior to 1798. Because the Court does not apply any rule articulated in these cases and I otherwise agree with the analysis and conclusions reached, I join the opinion of the Court fully. I write separately for the sole purpose of expressing my view on the limited value of such cases to our consideration of the common law that was incorporated into our Constitution.

In my view, such cases have value only to the extent they contain meaningful and persuasive analysis of the state of the common law as it existed in England in 1776 or in Georgia prior to 1798. Such analysis would serve as persuasive authority. Here, however, as noted in footnote 41 by the Court, none of these cases rely on pre-1776 English decisions applying the common law of England nor do they include any express indication of their effort to make such an analysis. Likewise, they do not rely on nor provide a meaningful analysis of any Georgia authority. Thus, these cases have no persuasive value when analyzing the common law that was

incorporated into our State's Constitution. Accordingly, I see no reason to give them further consideration, and I view the Court's efforts to analyze, characterize, and distinguish those cases as unnecessary.

I am authorized to state that Justice LaGrua joins in this concurrence.

COLVIN, Justice, concurring specially.

Division III of the majority opinion addresses Taylor's argument that the portion of OCGA § 51-12-5.1 (g) establishing a $250,000 cap on punitive-damages awards violates the Georgia Constitution's right to trial by jury. The majority opinion resolves this issue by applying our reasoning in *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt,* 286 Ga. 731 (691 SE2d 218) (2010), where we determined that a statutory cap on *compensatory* damages violated the constitutional right to a jury trial. But *Nestlehutt* expressly stated that its reasoning did not apply in the context of *punitive* damages, see *Nestlehutt,* 286 Ga. at 736 (2) (b), and, in my view, extending *Nestlehutt* is unnecessary in this case. The challenge to the punitive-damages cap at issue here is easily resolved under *Teasley v. Mathis,* 243 Ga. 561 (255 SE2d 57) (1979), and *State v. Moseley,* 263 Ga. 680 (436 SE2d 632) (1993), where we rejected claims that the constitutional right to a jury trial prevented the legislature from establishing statutory limits on punitive damages. Because neither party asks us to overrule *Teasley* or

125

*Moseley*, and because I am unsure whether *Nestlehutt* was correctly decided, I would reject the challenge to the punitive-damages cap at issue here under *Teasley* and *Moseley* rather than extending *Nestlehutt* to do so.[67] Accordingly, I concur only in the result of Division III.

In *Teasley*, a plaintiff, who sought exemplary damages for negligence arising from a car accident, challenged Georgia's "no fault" automobile insurance statute, which prevented accident victims from suing for exemplary damages unless they sustained a "serious injury." *Teasley*, 243 Ga. at 561-562. On appeal, we rejected the plaintiff's argument that the statute "depriv[ed] him of his right to a jury trial." Id. at 564 (2). Because "[t]he legislature . . . may modify or abrogate common law rights of action, as well as statutorily created rights," we explained, "eliminating the right to sue for exemplary damages where there are no serious injuries is

---

[67] I thank the Attorney General of Georgia for his helpful brief as amicus curiae, which persuasively argued both that this Court should apply the *Teasley*/*Moseley* line of cases and that this Court should reconsider *Nestlehutt* in an appropriate case.

well within the province of the legislature." Id. (citations omitted).

We addressed another challenge to a statutory limit on recovery for punitive damages in *Moseley*. See *Moseley*, 263 Ga. at 681 (2). There, the plaintiffs challenged a Georgia statute that required a trial court to apportion a punitive damages award between a plaintiff and the State. See id. In an argument that bears a striking resemblance to Taylor's argument here, the plaintiffs in *Moseley* contended that the statute violated Georgia's constitutional right to trial by jury because, "under the common law[,] it was the function of the jury to determine what amount of punitive damages must be awarded to a plaintiff to punish or deter a defendant." Id. Relying on *Teasley*, we rejected the plaintiffs' argument, concluding that the provision of Georgia's Constitution guaranteeing the right to a trial by jury "has no such effect" and does not "prohibit[ ] the General Assembly from abrogating or circumscribing common law or statutory rights of action." Id.

As *Nestlehutt* correctly noted, *Teasley* and *Moseley* performed "only [a] cursory analysis [of] the right to jury trial issue, which was

127

summarily resolved in reliance on precedent that did not address the right to jury trial at all." *Nestlehutt*, 286 Ga. at 736 (2) (b). Nevertheless, even "summarily" decided opinions "with no analysis" are "binding precedent" until overruled, *Olevik v. State*, 302 Ga. 228, 244 (2) (c) (iii) (806 SE2d 505) (2017), and there is no question that our decisions in *Teasley* and *Moseley* resolve Taylor's challenge to the statutory punitive-damages cap. Both cases concluded that Georgia's constitutional right to a jury trial does not prevent the legislature from "circumscribing" recovery for punitive damages. *Moseley*, 263 Ga. at 681 (2). See *Teasley*, 243 Ga. at 564 (2). Accordingly, regardless of whether the cause of action at issue here was recognized at common law, and regardless of whether "it was the function of the jury [at common law] to determine what amount of punitive damages must be awarded to a plaintiff," *Moseley*, 263 Ga. at 681 (2), *Teasley* and *Moseley* permit only one conclusion here—that OCGA § 51-12-5.1 (g)'s cap on punitive damages does not violate the constitutional right to a jury trial.

Admittedly, there is a tension between *Teasley*'s and *Moseley*'s

conclusion that the legislature can limit punitive-damages awards without infringing upon the constitutional right to a jury trial and *Nestlehutt*'s conclusion that the right to a jury trial prevents the legislature from capping compensatory damages for certain claims. But *Nestlehutt* itself addressed this tension, concluding that *Teasley* and *Moseley* "do not support a different result" because "these cases addressed statutory limits on *punitive* damages, which, unlike the measure of actual damages suffered are not really a 'fact' 'tried' by the jury."[68]    *Nestlehutt*, 286 Ga. at 736 (2) (b) (citation and

---

[68] The majority opinion misinterprets this statement in *Nestlehutt*, describing it as "dicta," Maj. Op. at 57 n.32, that did "not limit[ *Nestlehutt*'s reasoning] to a specific type of damages," Maj. Op. at 43 n.23.  To the contrary, *Nestlehutt*'s statement that punitive-damages determinations are not *factual* determinations was not dicta because it was key to explaining why *Teasley* and *Moseley* did not dictate "a different result."  *Nestlehutt*, 286 Ga. at 736 (2) (b). See *S. Georgia Med. Ctr. v. Washington*, 269 Ga. 366, 367, 497 S.E.2d 793, 795 (1998) ("An adjudication on any point within the issues presented by the case cannot be considered a dictum, and this rule applies as to all pertinent questions, although only incidentally involved, which are presented and decided in the regular course of the consideration of the case, and lead up to the final conclusion, and to any statement in the opinion as to a matter on which the decision is predicated." (citation and punctuation omitted)). Further, in distinguishing *Teasley* and *Moseley* on that basis, *Nestlehutt* clarified that its analytical framework for determining whether a statutory limit on damages violated Georgia's constitutional right to a trial by jury did not apply to a specific class of damages.  Specifically, *Nestlehutt* stated that its analytical framework did not apply to statutory limitations on *punitive*

punctuation omitted; emphasis in original).  It is clear from this statement that this Court cannot apply *Nestlehutt* to the claim at issue here, which challenges a statutory cap on *punitive* damages, without extending *Nestlehutt* in a way that would conflict with what the opinion itself expressly stated.  It is also clear from this statement that *Teasley* and *Moseley* remain good law.[69]  Because Taylor's challenge to the statutory punitive-damages cap can be resolved in straightforward fashion under *Teasley* and *Moseley*— which the parties have not asked us to overrule—there is no need to extend *Nestlehutt* in this case.[70]

---

*damages* because punitive-damages determinations are not determinations of *fact* to which the right to a jury trial could attach.  See *Nestlehutt*, 286 Ga. at 736 (2) (b) (noting that the United States Supreme Court had held in *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424 (121 SCt 1678, 149 LE2d 674) (2001), that, "because [a] punitive damages award does not constitute [a] finding of fact, potential limitations on [the] size of awards do not implicate [the] Seventh Amendment jury trial right").  Because *Nestlehutt* stated that its reasoning did not apply in the context of punitive damages, the majority opinion erroneously states that "applying *Nestlehutt*'s reasoning in this case does not 'extend' *Nestlehutt*."  Maj. Op. at 43 n.23.

[69] As noted above, *Nestlehutt* made statements critical of *Teasley* and *Moseley*.  However, *Nestlehutt* did not expressly overrule or disapprove of the holdings of those cases.

[70] I find the majority opinion's explanations for why it cannot look to *Teasley* and *Moseley* to answer the constitutional question Taylor presents unpersuasive.  First, although the majority opinion claims that neither *Teasley*

I am also reluctant to extend *Nestlehutt* here because it is unclear whether the case was correctly decided. *Nestlehutt* reasoned that the Georgia Constitution "guarantees the right to a jury trial only with respect to cases as to which there existed a right to jury trial at common law or by statute at the time of the adoption of the Georgia Constitution in 1798." *Nestlehutt*, 286 Ga. at 733 (2) (citation and punctuation omitted). *Nestlehutt* then canvased the common law and concluded that, at common law, medical-negligence

---

nor *Moseley* answers the precise question at issue here, see Maj. Op. at 38-39, the majority opinion makes the question presented more complicated than it needs to be. As I explained above, applying the principles announced in *Teasley* and *Moseley* to this case cleanly resolves Taylor's challenge to the punitive-damages cap. Second, the majority opinion criticizes *Teasley* and *Moseley* for employing weak reasoning. See Maj. Op. at 39-41. But the fact that the cases employed weak reasoning does not mean that they reached the wrong conclusions. Nor does it deprive the cases of their status as binding precedent. See *Olevik*, 302 Ga. at 244 (2) (c) (iii). Third, the majority opinion states that "the summary conclusions contained in *Teasley* and *Moseley* . . . were necessarily rejected by this Court in *Nestlehutt*, insofar as *Teasley* and *Moseley* failed to recognize the limit the Georgia Constitution may put on the legislature's ability to modify causes of action. Maj. Op. at 42. As noted above, however, *Nestlehutt* itself concluded that *Teasley*'s and *Moseley*'s holdings did not conflict with the principle that "the Legislature [cannot] abrogate constitutional rights," reasoning that *Teasley* and *Moseley* addressed determinations of punitive damages to which the constitutional right to a jury trial did not apply. *Nestlehutt*, 286 Ga. at 736 (2) (b) (emphasis omitted). Thus, disapproving of *Teasley* and *Moseley* "[t]o th[at] extent" does not explain why this Court should not apply those cases here. Maj. Op. at 42-43.

claims were well established, juries were tasked with determining the amount of damages, and damages could be awarded for noneconomic damages. See id. at 733-735 (2) (a). Based on these determinations, *Nestlehutt* concluded that Georgia's constitutional right to a trial by jury guaranteed the right to a jury trial for medical-negligence claims, "with an attendant right to the award of the full measure of damages, including noneconomic damages, as determined by the jury." Id. at 735 (2) (a). *Nestlehutt* further reasoned that the statute "requiring the court to reduce a noneconomic damages award determined by a jury that exceeds the statutory limit" of $350,000 "clearly nullifie[d] the jury's findings of fact regarding damages" and therefore "infringe[d] on a party's constitutional right . . . to a jury determination as to noneconomic damages." Id. at 735-736 (2) (b).

While *Nestlehutt*'s conclusion may be correct, it appears inconsistent with the traditional understanding of the constitutional right to trial by jury. See *Elliott v. State*, 305 Ga. 179, 212 (IV) (B) (824 SE2d 265) (2019) ("[W]here the right enshrined in the

132

constitution was one found at common law, that constitutional right is understood with reference to the common law, absent some clear textual indication to the contrary.").  At common law, the right to a trial by jury functioned primarily as a procedural safeguard, limiting the potential for a corrupt or biased judge to work injustice on a party by dividing authority between judge and jury.  See 3 William Blackstone, *Commentaries* \*\*379-380 ("[I]f [the administration of justice] be entirely entrusted to the magistracy, a select body of men, and those generally selected by the prince or such as enjoy the highest offices in the state, their decisions, in spite of their own natural integrity, will have frequently an involuntary bais[ ] towards those of their own rank and dignity . . . . [I]n settling and adjusting a question of fact, when [e]ntrusted to any single magistrate, partiality and injustice have an ample field to range in . . . . [T]herefore a competent number of sensible and upright jurymen chosen by lot from among those of the middle rank, will be found the best investigators of truth, and the surest guardians of

public justice.").[71]  See also Austin Wakeman Scott, *Trial by Jury and the Reform of Civil Procedure*, 31 Harv. L. Rev. 669, 676-677 (1918) ("At the time when the first permanent settlements were being established in America there was a great deal of popular enthusiasm in England for trial by jury . . . . based chiefly on the value of the institution as a bulwark of liberty, as a means of preventing oppression by the Crown. . . . In the American colonies during the eighteenth century there was a gradually increasing popular enthusiasm for trial by jury and a popular desire strictly to limit the powers of the judges and to give the jury great latitude[ because t]he Crown judges were generally and increasingly unpopular.").  Judges were entrusted to make legal determinations based on general principles of law.  See 3 William Blackstone, *Commentaries* *380 ("It is wisely . . . ordered, that the principles and axioms of law, which are general propositions, flowing from

---

[71] See *Nestlehutt*, 286 Ga. at 733 (2) (noting that "Blackstone, whose commentaries constituted the law of this State, before and since the Revolution,' [are] authoritative on [the] jury trial right as of 1798" (citation and punctuation omitted)).

abstracted reason, and not accommodated to times or to men, should be deposited in the breasts of the judges . . . .").  But answering factual questions was a task left for the jury.  See 3 William Blackstone, *Commentaries* \*366 (noting that "jurors . . . are the judges of fact" and "are impaneled and sworn to try" the "facts").  See also Scott, *Trial by Jury and the Reform of Civil Procedure*, *supra* at 677 ("It may safely be said that at the time of the American Revolution the general principle was well established in the English law that juries must answer to questions of fact and judges to questions of law." (citation and punctuation omitted)).

Against this backdrop, it is clear from the text of Georgia's constitutional provision protecting the right to trial by jury that the constitutional right, as applied to a civil case, includes a procedural right to have a jury, rather than a judge, decide questions of *fact*.  Indeed, the text of that constitutional provision emphasizes this point, explaining that, in contrast with a jury in a civil case, a jury in a criminal case decides both the facts and the law:

The right to trial by jury shall remain inviolate, except

> that the court shall render judgment without the verdict of a jury *in all civil cases* where no issuable defense is filed and where a jury is not demanded in writing by either party. *In criminal cases*, the defendant shall have a public and speedy trial by an impartial jury; and *the jury shall be the judges of the law and the facts.*

Ga. Const. of 1983, Art. I, Sec. I, Par. XI (a) (emphasis supplied).

*Nestlehutt* correctly recognized that "the amount of damages sustained by a plaintiff is ordinarily an issue of fact" and that the right to a jury trial has therefore been understood as "includ[ing] the right to have a jury determine the *amount* of damages, if any, awarded to the plaintiff." *Nestlehutt*, 286 Ga. at 734 (2) (a) (citation and punctuation omitted; emphasis in original). But it does not follow from the existence of a procedural right to have a jury, rather than a judge, make factual findings about damages that, as *Nestlehutt* concluded, the right to a jury trial also guarantees a substantive "right to *the award of the full measure of damages . . . as determined by the jury.*" Id. at 735 (2) (a) (emphasis supplied). Because reducing a damages award as prescribed by law does not require a judge to act as a factfinder or substitute his judgment for

136

that of the jury, doing so does not appear to "infringe" on or "nullif[y]" the procedural right to have a jury make factual findings regarding damages. Id. at 735 (2) (b). Thus, in concluding that a court violates the right to a jury trial by reducing damages in accordance with a statutory cap, *Nestlehutt* appeared to recognize a novel substantive component of the right—a substantive right to a particular remedy that limits a legislature's ability to define the legal principles applicable to a cause of action.[72]

We should take a careful look at *Nestlehutt* in an appropriate case. In this case, however, we need not reconsider *Nestlehutt* or extend it. Instead, I would resolve Taylor's challenge to the statutory punitive-damages cap under *Teasley* and *Moseley*. Because those cases dispose of Taylor's challenge, I concur only in the result of Division III.

---

[72] As the Attorney General notes in his brief as amicus curiae, "[i]f taken to its logical conclusion," *Nestlehutt*'s view of the right to a jury trial as including a "substantive component" would have "drastic" implications, "freez[ing] any limits on liability as they existed in 1798," preventing the legislature from "eliminat[ing] or restrict[ing] archaic causes of action," and "invalidat[ing] scores of statutes or common-law doctrines that modified common law causes of action."

ELLINGTON, Justice, dissenting in part, concurring in the judgment only in part.

1. I agree with much that is said in Division III of the majority opinion, but disagree with the majority opinion's ultimate conclusion that OCGA § 51-12-5.1 (g), which required the trial court to reduce the jury's award of punitive damages in this case to $250,000, does not violate the right to trial by jury protected by Article I, Section I, Paragraph XI (a) of the Georgia Constitution of 1983. Accordingly, I respectfully dissent in Division III of the majority opinion.

(a) If this issue of whether the General Assembly can circumscribe a jury's determination of damages must be decided based on the scope of the constitutional right to a jury trial as it existed when Georgia first protected the right, according to our holding in *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga. 731 (691 SE2d 218) (2010),[73] we must be guided by foundational

---

[73] I accept that departing from the analytical framework set out in *Nestlehutt* would require a stare decisis analysis. I am not persuaded by *Nestlehutt*, the authority the majority cites, and cases that have followed

138

documents and first principles. Initially, I take issue with the

majority opinion's use of 1798 as the "key date" for our constitutional

analysis in this case. The majority opinion cites to this Court's

analysis in *Benton v. Georgia Marble Co.*, 258 Ga. 58 (365 SE2d 413)

(1988), that "[i]t has been held that the Georgia Constitution (Art. I,

Sec. I, Par. XI) guarantees the right to a jury trial only with respect

---

*Nestlehutt*, however, that developments in Georgia law between the late eighteenth century and 1987, when the General Assembly imposed caps on punitive damages, must be deemed irrelevant here. The people of Georgia adopted a constitution in 1983 affirming that the right to trial by jury shall remain inviolate. Certainly, at that time, the common understanding was that a Georgia jury could determine the amount of punitive damages warranted in a tort case in which there were aggravating circumstances. Juries had been doing so for decades, and large awards drew much public attention. The understanding of the availability of jury-determined punitive damages at the time our most recent constitution was adopted should have at least some bearing on our analysis of the scope of the constitutional right to trial by jury. See *De Lamar v. Dollar*, 128 Ga. 57, 64 (57 SE 85) (1907) ("The validity of the county court act of 1872 in so far as it deprives parties to a case involving $50 or less, of a trial by jury, depends upon whether it violated that provision of the Constitution of 1868 [the constitution in effect when the statute was adopted] which declared that trial by jury should remain inviolate. At the time the Constitution of 1868 took effect, *in every court having jurisdiction to try a common-law case of a civil nature, the parties were secured the right of trial by jury,*" either in the first instance on demand or on appeal. "*This was the character of trial by jury that the Constitution [of 1868] intended to preserve.*" (emphasis supplied); see also *Kemp v. Gonzalez*, 310 Ga. 104, 108 (849 SE2d 667) (2020) (constitutional language that has received consistent and definitive construction and is then readopted into a new constitution is presumed to carry the same meaning as that prior construction); *Elliott v. State*, 305 Ga. 179, 184-187 (II) (B) (824 SE2d 265) (2019) (same).

139

to cases as to which there existed a right to jury trial at common law or by statute at the time of the adoption of the Georgia Constitution in 1798." In *Nestlehutt*, this Court judged it to be "well established" that Georgia's constitution guarantees the right to a jury trial only with respect to cases as to which the right was protected in 1798. *Nestlehutt*, 286 Ga. at 733 (2). And here the majority opinion insists that the "1798 cutoff" for analysis of the right to trial by jury is "well-settled" and "significant." Slip Op. at 31.

As *Tift v. Griffin*, 5 Ga. 185 (1848), another case cited by *Nestlehutt*, makes clear, however, 1798 was the key date in *Tift* only because, when *Tift* was decided, the 1798 constitution, Georgia's third constitution, was the most recently adopted.[74] The Court specifically referenced that all three constitutions adopted in Georgia by that time had affirmed the right to trial by jury. In *Tift*, this Court gave a "brief history of the right of trial by jury," including the following:

---

[74] The same goes for another 1848 case cited in the majority opinion, *New Flint River Steamboat Co. v. Foster*, 5 Ga. 194, 207-208 (1848). See Slip Op. at 29.

The right [of trial by jury] came with the colonists. It was derived from *Magna Charta.* It was their birth right. They brought with them the *Common Law,* so far as it was applicable to their condition. . . . In the year 1770, the Provincial Assembly [of the British colony of Georgia] asserted their right to the privileges of the Common Law, and more especially to the *"great and inestimable privilege of being tried by their peers of the vicinage, according to the cause of the Common Law."* This was done by solemn resolution of the Assembly, and was declaratory of rights which then, and prior to that time, belonged to the Colony. When the State became independent of the *British Crown,* this right of being tried by their peers, appertained to the people. It was one of the great bases of the new civil polity. . . . The Constitution of the United States affirmed the right in criminal cases originally, and by an amendment, in civil cases in 1789. Our Constitutions of 1777, of 1789, of 1798, adopt and

affirm the right. The last, in the language before quoted, which is now the organic law of the State.

*Tift*, 5 Ga. at 188-189.[75] This Court's subsequent treatment of 1798 as the key date for analysis of the right to trial by jury, no matter how many times repeated,[76] does not change the historical fact that the people of Georgia adopted constitutions in 1777 and 1789

---

[75] See *De Lamar*, 128 Ga. at 59-61 (The declaration in Georgia constitutions, including the constitutions of 1777, 1789, and 1798, that trial by jury "shall remain inviolate" meant that trial by jury "must be preserved in the future in all cases in which it was allowed under valid laws existing at the time that the Constitution was adopted." Regarding "common-law jurisdiction in civil cases," an expression "intended to embrace only cases which were the subject of real, personal, or mixed actions, according to the practice of the English common-law courts," and not those proceedings only authorized under Georgia statutes, this Court "found no court in existence prior to the Constitution of 1777, which had such jurisdiction "in which trial by jury was not provided for.").

[76] See also *Swails v. State*, 263 Ga. 276, 278 (3) (431 SE2d 101) (1993) (following *Foster* in identifying 1798 as the key date for an analysis of the right to trial by jury); *Hudson v. Abercrombie*, 258 Ga. 729, 730 (2) (a) (374 SE2d 83) (1988) (following *Foster* and *Williams* in identifying 1798 as the key date for an analysis of the right to trial by jury); *Cawthon v. Douglas County*, 248 Ga. 760, 762 (1) (286 SE2d 30) (1982) (following *Williams* in identifying 1798 as the key date for an analysis of the right to trial by jury); *Williams v. Overstreet*, 230 Ga. 112, 116 (195 SE2d 906) (1973) (following *Foster* in identifying 1798 as the key date for an analysis of the right to trial by jury); *Foster*, 5 Ga. at 207-208 (identifying, without citation or analysis, 1798 as the key date for an analysis of the right to trial by jury).

enshrining the right, as correctly recited in *Tift*. To be clear, the correct date from which to measure the constitutional right to trial by jury in Georgia under the *Nestlehutt* framework should be the date when the people of Georgia *first* enshrined the right in a constitution: February 5, 1777. Although, as the majority opinion states, "no one has asked us to overrule our precedents setting the key date at 1798," Slip Op. at 31 n.20, I find it indefensible to perpetuate here our historical error, which was picked up in *Benton* and so greatly expanded in *Nestlehutt*.[77]

---

[77] I do not agree that correcting our identification of Georgia's first constitution requires consideration of the doctrine of stare decisis. None of the cases relied upon in the majority opinion for identifying 1798, as opposed to 1777, as the key date for an analysis of the right to trial by jury took into account any difference in the common understanding of the right in 1798 compared to the understanding in 1777. See *Nestlehutt*, 286 Ga. at 731; *Benton*, 258 Ga. at 66; *Williams*, 230 Ga. at 116. The specific question of whether 1798, as opposed to 1777, is the key date for an analysis of the right to trial by jury was not raised and decided in those cases. See *Schoicket v. State*, 312 Ga. 825, 832 (865 SE2d 170) (2021) ("[A] decision's holding is limited to the factual context of the case being decided and the issues that context necessarily raises." (citation omitted)). Even assuming that identifying 1798 as the key date constituted a holding in those cases, and assuming that consideration of the doctrine of stare decisis would be necessary to *stop* identifying 1798 as the key date for the analysis of the right to trial by jury, that holding is so plainly wrong it could not survive application of the doctrine. See *Ammons v. State*, 315 Ga. 149, 156 (2) (880 SE2d 544) (2022) ("The soundness of a precedent's reasoning is the most important factor" in reconsidering prior decisions.

(b) In the preamble to Georgia's Constitution of 1777, the General Assembly explained that, even before the execution of the Declaration of Independence by the General Congress meeting in Philadelphia, which dissolved all political connection between the colonies and the Crown of England, the General Congress recommended to any of the "respective assemblies and conventions of the United States" that had not yet established a government "to adopt such government, as may, in the opinion of the representatives of the people, best conduce to the happiness and safety of their constituents in particular, and America in general." Georgia's representatives heeded this advice. On February 5, 1777, the representatives of the people of Georgia "ordained and declared, that the following rules and regulations be adopted for the future government of the State." Paragraph LXI of that first constitution provided that "trial by jury" was "to remain inviolate for ever [sic]."

That first constitution also had several specific provisions

---

(citation omitted)).

regarding jury trials. Paragraph XL provided, in pertinent part,

> [a]ll causes of what nature soever, shall be tried in the
> supreme court, except as hereafter mentioned[.] . . . [I]f
> any plaintiff or defendant in civil causes shall be
> dissatisfied with the determination of the jury, then and
> in that case they shall be at liberty within three days to
> enter an appeal from that verdict, and demand a new trial
> by a special jury

chosen in the manner specified in that paragraph.[78] Paragraph XLI provided that

> [t]he jury shall be judges of law as well as of fact, and shall
> not be allowed to bring in a special verdict; but if all, or
> any, of the jury have any doubts concerning points of law,
> they shall apply to the bench, who shall each of them in

---

[78] Exceptions to the general rules appeared in Paragraph XLIV, for "[c]aptures, both by sea and land," and in Paragraph XLVI, which provided for the continuation of "courts of conscience" that had jurisdiction to try causes not amounting to more than ten pounds.

rotation give their opinion.

And Paragraph XLII provided that "[t]he jury shall be sworn to bring in a verdict according to law, and the opinion they entertain of the evidence; provided it be not repugnant to the rules and regulations contained in this constitution."[79]

Clearly, at Georgia's founding as a sovereign state, the people felt strongly about the government's duty to provide trial by jury for almost any legal dispute. The jury's determination was subject to review, not by trial or appellate judges, but only by a second jury. See Paragraph XL.[80] Under the plain terms of these expansive provisions, a jury was empowered to decide whether a plaintiff had proved a right to recover and what total damages the defendant

---

[79] See also Paragraph XXXVII (providing for venue in "[a]ll causes and matters of dispute between any parties residing in the same county"); Paragraph XXXVIII (providing for venue in "[a]ll matters in dispute between contending parties residing in different counties").

[80] See Christopher J. McFadden et al., Georgia Appellate Practice § 1:1 (Dec. 2022 update) (discussing the development after 1777 of judicial appellate review in Georgia).

should pay. In 1784, Georgia formally recognized the continuing force, as part of Georgia's own law, of the English common law as of May 14, 1776. See OCGA § 1-1-10 (c) (1) (providing that the 1784 act that adopted "the common laws of England as they existed on May 14, 1776," was not repealed by the 1981 Code of Georgia).[81]

(c) Cases discussed in the majority opinion show that England's

---

[81] The 1784 act "for reviving and enforcing certain laws therein mentioned" was necessitated by the disruptions of the war years ("the late convulsions in this State"), in which "several salutary laws were lost, and destroyed, that had from time to time been enacted by the general assembly" of Georgia. Robert Watkins et al., Digest of the Laws of Georgia, preface by the editor, p. 289 (1799) (Act No. 287, February 25, 1784). The act provided: "all and singular the several acts, clauses, and parts of acts that were in force, and binding on the inhabitants of the . . . province" of Georgia on May 14, 1776,

> so far as they are not contrary to the constitution, laws and form of government now established in this State, shall be, and are hereby declared to be in full force, virtue and effect, and binding on the inhabitants of this State . . . until the same shall be repealed, amended or otherwise altered by the legislature. And also the common laws of England, and such of the statute laws as were usually in force in the said province, except as before excepted.

Id. at 290. See *Tift*, 5 Ga. at 189 (Even without a legislative declaration of the right of being tried by one's peers, "it must have been considered inherent in that system of Government, which the State adopted. But in [17]84, our own *Legislature* adopted the Common Law of England, and such of the Statute Laws of England as were usually of force in the province of Georgia, except so far as they were contrary to the constitution and laws and form of Government then established. By this Act, if there were no other recognition of it, the right of trial by jury was asserted, as guaranteed by *Magna Charta*. Nor was it alone the right of trial by jury in criminal cases, but also in civil cases for that Charter provides for both.").

common law as of May 14, 1776, recognized the jury's broad authority to find aggravating circumstances in tort cases and to award, in addition to damages awarded to compensate plaintiffs for their injuries, additional damages to punish defendants and deter them from repeating tortious conduct. Therefore, I generally agree with the majority opinion's holdings within the *Nestlehutt* framework regarding pre-1776 common law juries: juries awarded damages in tort for what would later be called premises liability claims; juries generally determined the amount of damages to award in tort cases; juries in tort cases were authorized to award damages in excess of the actual injury suffered by a plaintiff based on aggravating circumstances; and juries were authorized to award, in addition to damages to compensate the plaintiff for the actual injury, damages specifically for the purpose of punishing the defendant. From these holdings, and given the breadth of a jury's authority under Georgia's first constitution, the conclusion is inescapable that the right to trial by jury deemed inviolable in the Constitution of 1777 embraced the right to have a jury determine whether to award

148

additional damages based on aggravating circumstances in a tortfeasor's acts or intentions and, if so, to determine the amount of punitive damages to award. In other words, the right to have a jury determine whether punitive damages are warranted and, if so, in what amount, inheres in a common law cause of action for premises liability, and, therefore, the General Assembly may not modify or abrogate that right by statute. See *Pollard v. State*, 148 Ga. 447, (96 SE 997 (1918) (The constitutional provision that the right of trial by jury shall remain inviolate "did not merely preserve the form or mode of trial, but the right of trial by jury in all its essential elements as it existed at common law and as it obtained in this state at the date of the adoption of our earliest Constitution.").

The majority opinion goes to great lengths to escape this conclusion and to decide the constitutionality of OCGA § 51-12-5.1 (g) in the narrowest possible terms. I disagree with the majority opinion's conclusion that Taylor loses her constitutional right to have a jury determine all of her damages solely because she does not argue that Devereux engaged in intentional misconduct but,

149

instead, pleads for punitive damages on the basis that Devereux's conduct "was such as to evince an entire want of care and indifference to the consequences of such conduct." The majority opinion frames all six pre-1776 English cases that Taylor points to as primary sources for jury-determined punishment damages as cases involving "a claim of intentional misconduct." The majority opinion holds that Taylor has therefore failed to show that punitive damages for a claim that a tortfeasor acted with an "entire want of care" was within the scope of the jury-trial right in Georgia in 1798. Notably, none of those cases describe the tortious conduct as "intentional" or address in any way the defendants' mental state.

More importantly, the "intentional misconduct" framing in the majority opinion distorts the facts underlying the three warrant-execution cases to exclude cases based on an entire want of care from the scope of the right to have a jury determine the amount of punitive damages. Unlike the cases involving physical attacks or malicious prosecution, the warrant-execution cases involved conduct that the defendants understood to be legally sanctioned, even

150

*required* of them as agents of the government acting at the direction of their superiors. Specifically, the case reports show that the defendants entered the plaintiffs' residences and otherwise infringed on the plaintiffs' liberty in search of evidence of seditious libel because warrants issued in the name of the King by Lord Halifax, a secretary of state, commanded the "King's messengers" to do so. See *Wilkes v. Wood*, 98 Eng. Rep. 489 (King's Bench, 1763) (*North Briton, No. 45*); *Huckle v. Money*, 95 Eng. Rep. 768 (King's Bench, 1763) (*North Briton, No. 45*); *Beardmore v. Carrington et al.*, 95 Eng. Rep. 790 (King's Bench, 1764) (*The Monitor or British Freeholder*). The defendants in these cases were either the King's messengers or, in Wood's case, sent by Lord Halifax to supervise messengers in the execution of a warrant. The defendants' conduct constituted trespass (along with false imprisonment in *Huckle* and *Beardmore*, in which the plaintiffs were detained) only because the warrants the defendants executed were determined to have been

issued illegally.[82] In *Beardmore,* the Court acknowledged the

[82] In this case, we are concerned with the scope of the right to trial by jury and, within the *Nestlehutt* framework, whether pre-1776 English juries awarded punitive damages only in cases involving intentional misconduct, as the majority opinion concludes. Consequently, it is not necessary to discuss in detail the development, and ultimate scope, of the rejection of the use of general warrants, although these and related cases are studied in detail by scholars of the development of the Fourth Amendment to the United States Constitution and related state protections against unreasonable searches and seizures and warrant requirements. To oversimplify, dozens of people were arrested and subjected to search as a result of general warrants that Lord Halifax issued in 1762 and 1763. Litigation over the execution of the warrants continued until 1769. In the course of dozens of cases, multiple reasons were advanced, considered, and rejected or accepted in various combinations for holding the warrants to be illegal or for finding that the manner in which the warrants were executed to constitute trespass, including: the warrants did not identify the persons to be seized; the warrants directed that all of an arrested suspect's papers be seized, rather than those relevant to the alleged seditious libel; taking a person's papers to prove libel violated the rights against compelled self-incrimination; the "precedents" or custom Lord Halifax relied on as the authority for issuing such warrants was contrary to common law; Lord Halifax acted only as a secretary of state (and only justices of the peace were designated by statute were authorized to issue arrest warrants for the alleged crimes); Lord Halifax did not issue the warrants based on evidence given under oath by a witness; evidence received before issuance of the warrants did not provide probable cause to arrest; the warrants required the messengers arresting a suspected author, publisher, or printer to be accompanied by a constable, but no constable attended them; and no inventory of seized material was returned. By about 1765 or 1766, enough of the cases had been resolved in the plaintiffs' favor, and covered in the press, that it should have been widely known that general warrants were illegal, but that was hardly well-settled law when warrants were executed in 1762 and 1763 to arrest authors, printers, or publishers of *The Monitor* or *The North Briton, No. 45.* See *Wilkes v. Wood,* 98 Eng. Rep. 489; *Huckle,* 95 Eng. Rep. 768; see also *Entick v. Carrington,* 95 Eng. Rep. 807, 810 (King's Bench, 1765) (At various times over the preceding 80 years, general warrants like that issued against the plaintiff "have been frequently granted by the Secretaries of State, and

argument that Lord Halifax was "more culpable, than the defendants, who [were] only servants, and [had] done what he commanded them to do." *Beardmore*, 95 Eng. Rep. at 793. Nevertheless, "[t]he jury were directed [by the trial court] to assess damages for the plaintiff according to the evidence given, under an idea that the defendants could not by law justify the trespass under [the] warrant by any manner of plea whatsoever." Id. at 792. Thus, the defendants were liable for the full amount of the plaintiff's damages because liability for the trespass was "joint and several" as a matter of law.[83] Id. at 793. From the defendants' points of view in

---

executed by the messengers in ordinary," under their oath to "be a true servant to the King[.]"); Id. at 812-813 (The plaintiff conceded that "never before [the] time" of the trial had general warrants granted by secretaries of state "been opposed or controverted[.]"); *Money v. Leach*, 96 Eng. Rep. 320, 97 Eng. Rep. 1050, 1745 (King's Bench, 1765); Thomas K. Clancy, "The Fourth Amendment's Concept of Reasonableness," 2004 Utah L. Rev. 977, 984-987 (2004); T.T. Arvind, et al., "A New Report of *Entick v. Carrington* (1765), 110 Ky. L.J. 265, 298-332 (2022) (containing *Entick v. Carrington*, as reported by Edward Moore); Thomas Y. Davies, "Recovering the Original Fourth Amendment," 98 Mich. L. Rev. 547, 560-570 (1999).

[83] The majority opinion misrepresents the *Beardmore* case in saying that the Court "described *the defendant's* actions as 'an unlawful power assumed by a great minister by State[.]'" Slip Op. at 53, 65. The Court was actually describing the actions of *Lord Halifax* who issued the illegal warrant to be served by the defendants, the King's messengers.

all three of the warrant-execution cases, however, they had legal authority and justification to enter the plaintiffs' homes and seize evidence, so their conduct cannot fairly be classified as intentional misconduct in the same vein as punching a person in the face or falsely accusing a person of a crime. Rather, the defendants in the warrant-execution cases at most acted without care in failing to refuse Lord Halifax's directive to execute the warrants. Although none of the cases Taylor cited expressly recognize the culpability category of an "entire want of care" in those words, the warrant-execution cases show that pre-1776 English juries could and did award punishment damages even absent intentional misconduct. The majority opinion overreaches in holding that all six of the pre-1776 English cases Taylor cited involved "intentional misconduct" when fully half of them did not involve any intentional violation of the plaintiffs' rights by the defendants.

It is hardly surprising that *neither* party found any pre-1776 cases either expressly allowing or expressly rejecting the recovery of additional damages based on a defendant's "entire want of care."

154

Before the Tort Reform Act of 1987, Georgia law recognized that in *every* tort there may be aggravating circumstances and provided that, "[i]n a tort action in which there are aggravating circumstances, in either the act or the intention, the jury may give additional damages to deter the wrongdoer from repeating the trespass or as compensation for the wounded feelings of the plaintiff." OCGA § 51-12-5 (1986).[84] See also *Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 122 (5) (365 SE2d 827) (1988) (OCGA § 51-12-5 "states that in every tort there may be aggravating circumstances, either in 'the act or the intention' in which event additional or punitive damages may be awarded.); Ga. Code Ann. 1860 § 2998 ("In every tort there may be aggravating circumstances, either in the act or the intention, and in that event the jury may give additional damages, either to deter the wrongdoer from repeating the trespass,

---

[84] Cf. Ga. L. 1987, p. 915, § 4 ("striking in its entirety Code Section 51-12-5, relating to additional damages for aggravating circumstances, and inserting in its place a new Code Section 51-12-5 to read as follows: 51-12-5. (a) In a tort action in which there are aggravating circumstances, in either the act or the intention, the jury may give additional damages to deter the wrongdoer from repeating the trespass or as compensation for the wounded feelings of the plaintiff. (b) This Code section shall apply only to causes of action for torts arising before July 1, 1987.").

or as compensation for the wounded feelings of the plaintiff."). And the law made special provision for compensatory damages for torts for which the entire injury is to the peace, happiness, or feelings of the plaintiff and for which the only measure of damages is the enlightened conscience of impartial jurors.[85] The Tort Reform Act of 1987 replaced the broad descriptive term "aggravating circumstances, in either the act or the intention" with a list of types of culpable conduct drawn from Georgia's decisional law on punitive damages: "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1 (b).[86] See OCGA § 51-12-5 (b). These types of culpable conduct

---

[85] See OCGA § 51-12-6 (1986) ("In some torts the entire injury is to the peace, happiness, or feelings of the plaintiff; in such cases no measure of damages can be prescribed, except the enlightened conscience of impartial jurors. The worldly circumstances of the parties, the amount of bad faith in the transaction, and all the attendant facts should be weighed. The verdict of a jury in such case should not be disturbed, unless the court should suspect bias or prejudice from its excess or its inadequacy."); Ga. Code Ann. 1860, § 2999 (same, with different punctuation).

[86] See *Chattanooga, Rome & Columbus R. Co. v. Liddell*, 85 Ga. 482, 495-496 (5) (11 SE 853) (1890) ("[T]he absence of [the] care [that was required to avoid a railroad accident], whether called gross or ordinary negligence, did not

have the common element of being greater than gross negligence. See *Southern R. Co. v. O'Bryan*, 119 Ga. 147, 148-149 (1) (45 SE 1000) (1903) ("Mere negligence can never amount to . . . aggravating circumstances [in a tortfeasor's act or intention] as to warrant the imposition of . . . [additional] damages [under a predecessor to OCGA § 51-12-5], and this is true though the negligence be gross."); *Chattanooga, Rome & Columbus R. Co. v. Liddell*, 85 Ga. 482, 495-

---

authorize the jury to visit the [company] with damages beyond the limit of compensation for the injury actually inflicted. To do this there must have been some willful misconduct, or that entire want of care which would raise the presumption of a conscious indifference to consequences. . . . In order to warrant a jury in giving vindictive damages, something more than mere unlawfulness must be shown; there must be evidence either of malice, fraud, wantonness, or oppression. The act must have been done under such circumstances as show a disregard for the rights of others, or an intention to set at defiance the legal rights of others, or the ordinary obligations of society." (citation and punctuation omitted)); see also *Ponce de Leon Condominiums v. DiGirolamo*, 238 Ga. 188, 189 (1) (232 SE2d 62) (1977) ("To authorize the imposition of punitive or exemplary damages, there must be evidence of willful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences. The latter expression relates to an intentional disregard of the rights of another, knowingly or wilfully disregarding such rights." (citations and punctuation omitted)); *Parsons v. Ponder*, 161 Ga. App. 723, 724 (2) (288 SE2d 751) (1982) ("To authorize the imposition of exemplary damages, or punitive damages as they are commonly called, under Code Ann. § 105-2002[, the immediate predecessor to OCGA § 51-12-5,] there must be evidence of wilful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences." (citation and punctuation omitted)).

157

497 (5) (11 SE 853) (1890) (accord). OCGA § 51-12-5.1 treats all of these types of culpable conduct equally, capping them unless the defendant acted with the specific intent to cause harm (or, under the 2010 amendment while the defendant's judgment was impaired by alcohol or drugs). OCGA § 51-12.5.1 (f).

As previously discussed, a close reading of the pre-1776 English cases identified by Taylor undercuts the majority opinion's holding that juries of that era awarded punitive damages only in cases involving intentional misconduct.[87] The majority opinion errs in using this holding to carve out cases involving an entire want of care from the universe of tort cases in which juries historically could award punitive damages, thereby avoiding the broader question of whether the right to a jury trial in Georgia inheres in awards for punitive damages generally, such that the punitive damages cap in

---

[87] See *Reid v. Morris*, 309 Ga. 230, 235 ((845 SE2d 590) (2020) (explaining OCGA § 51-12.5.1's three-tiered structure for punitive damages awards: (1) cases involving products liability claims, (2) cases involving a specific intent to harm the plaintiff, and (3) cases involving willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences).

OCGA § 51-12-5.1 (g) is unconstitutional. As discussed above, Georgia constitutionally guaranteed the right to trial by jury at a time when a jury had the authority to award additional, exemplary damages for whatever conduct the jury found egregious enough to warrant such damages. Having a jury determine the amount of punitive damages, unfettered by legislative acts, was an essential element of the right to trial by jury as it existed at common law and as it continued to be protected in Georgia at the date of the adoption of our earliest Constitution. See *Nestlehutt*, 286 Ga. at 735 (2) (a); *Pollard v. State*, 148 Ga. at 447. Thus, even under the *Nestlehutt* framework, the right to a jury trial in Georgia inheres in awards for punitive damages generally, including for cases involving an entire want of care. It follows that the General Assembly wrongfully curtailed the constitutional right to a jury trial by requiring courts not to enforce a jury's determination of the amount of punitive damages warranted for a tortfeasor's willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to

159

consequences.[88]

For these reasons, I dissent in Division III.

2. In Division VIII, the majority opinion determines that Taylor is entitled to 40 percent of the recoverable damages under OCGA § 13-6-11 because she presented, in addition to her contingency-fee agreement for such recovery, some evidence of the value of the professional services actually rendered. In doing so, the majority opinion followed the analysis in *Ga. Dept. of Corrections v. Couch*, 295 Ga. 469 (759 SE2d 804) (2014), a case that dealt with attorney fees under OCGA § 9-11-68. The majority opinion states that both

---

[88] To the extent *Teasley v. Mathis*, 243 Ga. 561 (255 SE2d 57) (1979), and *State v. Moseley*, 263 Ga. 680 (436 SE2d 632) (1993), hold that the constitutional right to a jury trial does not prevent the General Assembly from establishing statutory limits on punitive damages, as advanced in Justice Colvin's concurrence, those cases failed to recognize the limits the constitutional right to trial by jury puts on the scope of the General Assembly's authority. See *Georgia Lions Eye Bank, Inc. v. Lavant*, 255 Ga. 60, 61-62 (2) (335 SE2d 127) (1985) ("A right of action existing at common law may be modified or abrogated by" the General Assembly "unless prevented by constitutional limitations."); see also *Nestlehutt*, 286 Ga. at 737 (2) (b) (agreeing with the general principle stated in *Moseley* and *Teasley* that the General Assembly has authority to modify or abrogate the common law, but rejecting the idea "that this general authority empowers the [General Assembly] to abrogate constitutional rights that may inhere in common law causes of action").

Taylor and Devereux "argue that we should look to the standard set out" in *Couch*. But Taylor does *not* argue that we *should* look to *Couch*. Rather, she assumes that we *will*, and she argues that she offered evidence of the value of her attorney's services sufficient under the approach of *Couch* and its progeny to support the trial court's award of fees. In the face of extensive Court of Appeals precedent requiring proof of the reasonable value of fees awarded under OCGA § 13-6-11,[89] this was a reasonable argument to make in the alternative, and it prevailed in the majority opinion.

The majority opinion's approach makes it unnecessary to reach Taylor's argument that "Devereux's entire argument is based on a 'reasonableness' requirement that does not exist in the plain language of Code Section 13-6-11." Thus, the majority opinion does not consider whether the difference in language between OCGA §

---

[89] See *Wimpy v. Martin*, 356 Ga. App. 55, 59-60 (3) (a) (846 SE2d 230) (2020); *City of Atlanta v. Hofrichter/Stiakakis*, 291 Ga. App. 883, 889-890 (3) (663 SE2d 379) (2008); *Home Depot U.S.A., Inc. v. Tvrdeich*, 268 Ga. App. 579, 584-585 (2) (602 SE2d 297) (2004); *Patton v. Turnage*, 260 Ga. App. 744, 746-749 (2) (580 SE2d 604) (2003); *Rivergate Corp. v. BCCP Enterprises, Inc.*, 198 Ga. App. 761, 761-762 (2) (403 SE2d 65) (1991).

13-6-11, which authorizes the recovery of "[t]he expenses of litigation," and statutes that authorize only "reasonable attorney fees" is legally significant. While the procedural posture of this case may permit resolution of *this* appeal without reaching the issue, it must be emphasized that the majority opinion does not hold that, despite its plain language, OCGA § 13-6-11 authorizes only reasonable attorney fees. This case cannot be cited as precedent for such a holding. If the procedural posture had compelled this Court to answer the question whether OCGA § 13-6-11 contains a reasonableness requirement and permits a *Couch*-type review of the evidence, I believe the plain text and the historical context of the statute would demand an answer in the negative.

Georgia follows the "American Rule" of attorney fees: even a prevailing litigant bears the cost of asserting his legal rights and can recover the expenses of litigation including his attorney fees from the opposing party only where authorized by a statutory provision

or by the parties' contract.[90] Several of Georgia's statutes that authorize an award of expenses of litigation and attorney fees authorize the trial court to grant only reasonable attorney fees,[91] which has generally required a determination, based on evidence, of the value of the legal services provided. See *Couch*, 295 Ga. at 483 (3) (a).[92] The amount of "reasonable" attorney fees, as determined by the finder of fact, will not necessarily match the amount of fees the

---

[90] See *Ga. Subsequent Injury Trust Fund v. Muscogee Iron Works*, 265 Ga. 790, 790-791 (462 SE2d 367) (1995); *Glynn County Fed. Employees Credit Union v. Peagler*, 256 Ga. 342, 344 (3) (348 SE2d 628) (1986); *Bowers v. Fulton County*, 227 Ga. 814, 815 (1) (183 SE2d 347) (1971); *Horton v. Dennis*, 325 Ga. App. 212, 215 (750 SE2d 493 (2013).

[91] See, e.g., OCGA §§ 9-11-68 (b) ("reasonable attorney's fees and expenses of litigation" incurred during a specified period in the case of certain offers of settlement rejected by the opposing party in civil litigation); 9-15-14 ("reasonable and necessary attorney's fees and expenses of litigation" in certain cases of frivolous litigation); 10-1-164 ("reasonable attorneys' fees to the prevailing party" in certain claims of misappropriation of a trade secret); 13-1-11 (allowing "obligations to pay attorney's fees upon any note or other evidence of indebtedness" and requiring that fees greater than $20,000 be reasonable); 51-7-83 ("costs and expenses of litigation and reasonable attorney's fees" in certain cases of abusive civil litigation).

[92] See also *Brock Built, LLC v. Blake*, 316 Ga. App. 710, 713-715 (2) (730 SE2d 180) (2012) (remanding for a determination of the value of an attorney's services, where employment contract provided for "all costs and expenses (including court costs and reasonable attorney fees) incurred by [employee] in connection with any litigation seeking to enforce [his] rights" under the agreement, provided that he was "substantially successful in such litigation" (punctuation omitted)).

litigant would owe under the contract of legal representation, which may provide for pro bono representation (no fees), a flat rate, an hourly rate, a contingent fee (usually a percentage of the monetary recovery for the litigant), or some other arrangement between attorney and client.

Unlike OCGA § 9-11-68, the Code section at issue in *Couch*, and many other statutes that provide for attorney fee awards, OCGA § 13-6-11, does not modify the term "the expenses of litigation" with "reasonable" or any similar term.[93] Likewise, the predecessors to OCGA § 13-6-11 extending at least back to the 1860 Code of

---

[93] See Ga. Code 1983, OCGA § 13-6-11 ("The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them."); Ga. Code Ann. 1933, Title XX, Part III, Chapter 20-14, § 20-1404; ("The expenses of litigation are not generally allowed as a part of the damages; but if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them."); Ga. Code Ann. 1910, Part II, Title VIII, Chapter VIII, § 4392 (same); Ga. Code Ann. 1895, Part II, Title VIII, Chapter VIII, § 3796 (same); Ga. Code Ann. 1882, Part II, Title VII, Chapter X, § 2942 (same); Ga. Code Ann. 1873, Part II, Title VII, Chapter X, § 2942 (same); Ga. Code Ann. 1867, Part II, Title 7, Chapter X, § 2891 (same); Ga. Code Ann. 1860, Part II, Title 7, Chapter IX, § 2883 (same).

Georgia[94] have never modified the term "the expenses of litigation."

The General Assembly found it proper to provide only for reasonable attorney fees in OCGA §§ 9-11-68 (b), 9-15-14, 10-1-164, and others, but brought forward the unrestricted term "the expenses of litigation" in OCGA § 13-6-11 and its predecessors in each Code revision since 1860. Thus, a plain reading of the text of OCGA § 13-6-11 indicates that, the other requirements of the Code section being met, a jury is authorized under § 13-6-11 to award a litigant's *actual*

---

[94] For purposes of this analysis, I am referring to the Code of the State of Georgia, prepared by R. H. Clark, T. R. R. Cobb, and D. Irwin, as "codifers," adopted by the General Assembly and signed into law by the governor on December 19, 1860, and published by John H. Seals, in Atlanta, Georgia, in 1861. See Ga. L. 1860, p. 24. The Code of 1860 designated that it would be effective on January 1, 1862. See id. Before the designated effective date, Georgia seceded from the union, and on March, 18, 1861, "a convention of the people, then in session" resolved to amend the Code "to conform to the government of the Confederate States, instead of the government of the United States[.]" See Ga. Code Ann. 1860, preface by the codifers, p. iv. On December 16, 1861, the General Assembly voted to delay the effective date of the Code to January 1, 1863, Ga. L. 1861, p. 27, and the original Code is also sometimes referred to as the Code of 1861 or the Code of 1863. See Jefferson James Davis, "The Georgia Code of 1863: America's First Comprehensive Code," 4 J. S. Legal Hist. 1 (1995-1996) (referring to the Clark, Cobb, and Irwin Code as the "Georgia Code of 1863," due to the delayed effective date); *Caldwell v. State*, 313 Ga. 640, 650 n.11 (872 SE2d 712) (2022) (McMillian, J., concurring) (same); Paul S. Milich, "Georgia's New Evidence Code – An Overview," 28 Ga. St. U. L. Rev. 379, 380 (2012).

expenses of litigation.[95]

---

[95] It would also be worth exploring whether the original predecessor to OCGA § 13-6-11 was intended to apply to tort claims at all. The codifers were charged with preparing

> for the people of Georgia a Code, which shall as near as practicable, embrace in a condensed form, the Laws of Georgia, whether derived from the Common Law, the Constitution of the State, the Statutes of the State, the Decisions of the Supreme Court, or the Statutes of England of force in this State[.] . . . [W]hen ratified and adopted by [the General Assembly], it may supercede [sic] all other laws and decisions and establish fixed and uniform law in the State of Georgia.

Ga. L. 1858, p. 95. See *Sons of Confederate Veterans v. Henry County Bd. of Commrs.*, 315 Ga. 39, 58 n.14 (2) (c) (ii) (880 SE2d 168) (2022) (explaining differences between current codification practices, which are generally limited to incorporating acts of the General Assembly, and the practices employed in Georgia's early codes).

As the codifers explained, they undertook to draft a code that would "arrange" the "somewhat chaotic mass" of the statutes of Georgia and in addition "to interweave" with the statutes "the great fundamental principles of our jurisprudence from whatsoever source derived" of which the statutes "constituted but disjointed parts." Ga. Code Ann. 1860, preface by the codifers, p. iii. See also id., preface by the committee appointed by the General Assembly to review the Code drafted by the codifers and to recommend whether to adopt it, p. vi (The Code was intended to mingle together "in condensed and intelligible form the common and statute Laws, Constitutional provisions and Court Decisions, and thus to place the whole body of all the Law within the reach of the people" and to refer every citizen "to the whole embodiment of the Law in a single volume to be exactly informed what are his rights in any and every exigency, and what his remedies for their enforcement and protection."). As part of this grand plan of organization and comprehensiveness, the codifers placed the 1860 predecessor to OCGA § 13-6-11, § 2883, in Part II (The Civil Code), Title VII (Contracts), Chapter IX (Breach of Contracts and Damages). In total, that chapter provided thirteen sections, most of which used the words "breach," "contract," or both. In context of the title and chapter in which it was placed, § 2883 can only be fairly read as providing that "[t]he expenses of litigation are not generally allowed as a part of the damages" in a suit for

166

breach of a contract, "but if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them."

In contrast, the Code of 1860, Part II, Title VIII (Torts), Chapter V (Damages) made no explicit reference to recovery of the expenses of litigation. Despite its placement in the title covering contracts, the text of the predecessors to OCGA § 13-6-11, viewed apart from the context of the rest of the chapter on breach of contracts and damages, did not expressly limit the Code section to contracts cases, and the section was soon applied in torts cases. See *Tift v. Towns*, 63 Ga. 237, 242 (3) (1879) (In a negligence action against a toll-bridge owner for failure to keep a bridge in proper repair, the jury awarded the plaintiff damages and "counsel fees," and the defendant argued that the award of counsel fees was not warranted by evidence that the defendant "had acted in bad faith, or had been stubbornly litigious, or had caused the plaintiff unnecessary trouble and expense" as provided in Irwin's Revised Code Ann. 1873 § 2942, another predecessor to OCGA § 13-6-11. This Court found the damages were excessive, in part because the award included counsel fees. The Court found that the defendant's resistance to the plaintiff's "too high" demand for damages did not amount to "wanton or excessive indulgence in litigation."); *Selma, Rome & Dalton R. Co. v. Fleming*, 48 Ga. 514 (1873) (noting in dicta that, "[u]nder section 2891, Irwin's Revised Code [1867]," the successor to Code Ann. 1860 § 2883, "damages for a *tort* may be increased by the expenses of litigation, if the defendant have shown himself specially litigious in the matter").

By 1903, applying § 3796 of the Civil Code of 1895, the latest successor to Code Ann. 1860 § 2883, which was still plainly lodged in Title VIII, Contracts, Chapter VIII, Breach and Damage, we noted in *Traders Ins. Co. v. Mann*, 118 Ga. 381 (45 SE 426) (1903), that attorney fees under the subsection for bad faith, stubborn litigiousness, or causing unnecessary trouble and expense had "usually been asked for by the plaintiff in actions ex delicto," that is, tort actions, listing numerous cases, including *Selma &c. R. Co.*, which we identified as "the first case construing this section." *Traders Ins. Co.*, 118 Ga. at 384. In *Traders Ins. Co.*, we doubtfully accepted that a few Georgia cases ex contractu *might* stand for the principle that "the right to recover expenses of litigation is not confined to actions sounding in tort," and held that, if so, "the same element of bad faith must appear in order to warrant their recovery in actions ex contractu." Id. at 385.

At some point, the General Assembly inserted "in making the contract" after "bad faith," which would indicate an intent that OCGA § 13-6-11 should

It is true that Taylor focuses on her alternative argument and says this Court "need not reach" the issue of the lack of a textual basis for Devereux's reliance on a "reasonableness" requirement for attorney fee awards under OCGA § 13-6-11, but this does not bind us to review the trial court's award as if *Couch* applies, effectively rewriting the Code section to include a reasonableness requirement not present in the text. The General Assembly is perfectly capable of limiting awards of statutory attorney fees to "reasonable" amounts, as demonstrated in the numerous statutes in which it did so, and it alone is authorized to amend OCGA § 13-6-11 to limit awards under that Code section. In this case, Taylor's actual expenses of litigation are 40 percent of the jury's enforceable verdict

---

*not* be applied in tort cases. See *Sepulvado v. Daniels Lincoln-Mercury, Inc.*, 170 Ga. App. 109, 110 (2) (316 SE2d 554) (1984) (quoting the immediate predecessor to OCGA § 13-6-11 as follows: "The expenses of litigation generally shall not be allowed as a part of the damages; but where the defendant has acted in bad faith in making the contract, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them."). But, in 1984, the General Assembly reversed that change. See Ga. L. 1984, p. 22, § 13 (deleting "in making the contract" from Code Section 13-6-11, relating to recovery of expenses of litigation generally). Therefore, even if this Court in the past incorrectly allowed the predecessors to OCGA § 13-6-11 to authorize expenses of litigation in tort cases, the General Assembly has since embraced that interpretation.

as attorney fees under her contingency fee contract with counsel, plus $288,055.03 in other litigation expenses proven at trial. The trial court reached the right result, even though it applied *Couch* to Taylor's claim under OCGA § 13-6-11. Accordingly, I concur in Division VIII only to the extent the majority opinion affirms the trial court's ruling that Taylor be awarded expenses of litigation under OCGA § 13-6-11 in that amount.